**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MAJOR BRANDS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:18-cv-00423-HEA |
| | ) | |
| MAST-JÄGERMEISTER US, INC., | ) | |
| SOUTHERN GLAZER'S WINE AND | ) | |
| SPIRITS OF MISSOURI, LLC, | ) | |
| SOUTHERN GLAZER'S WINE AND | ) | |
| SPIRITS, LLC, and SUPERIOR WINES | ) | **JURY TRIAL DEMANDED** |
| AND LIQUORS, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT**

COMES NOW Plaintiff, Major Brands, Inc. ("Major Brands"), by and through its undersigned counsel, and for its First Amended Complaint against Defendants Mast-Jägermeister US, Inc. ("Jägermeister"), Superior Wines and Liquors, Inc. ("Superior"), Southern Glazer's Wine and Spirits of Missouri, LLC ("Southern Missouri"), and Southern Glazer's Wine and Spirits, LLC ("SGWS," and, together with Southern Missouri and Superior, "Southern"), states as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.    Plaintiff Major Brands is a corporation organized and existing under the laws of the State of Missouri and is a resident of St. Louis City, Missouri, with its principal place of business located at 6701 Southwest Avenue, Saint Louis, Missouri 63143.

2.    Defendant Jägermeister is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 10 Bank Street, Suite 900, White Plains, New York 10606.

3.     Defendant Superior[1] is a corporation organized and existing under the laws of the State of Missouri, with its principal place of business located at 6201 Stillwell, Kansas City, MO 64120.  Superior is a licensed wholesale distributor of intoxicating liquor products in the State of Missouri, has been appointed to distribute over 12,000 brands of alcohol in the State of Missouri, and is a part of the Southern wholesale distribution network in the State of Missouri.  Superior is located at the same site as Southern Missouri's Kansas City facility and, upon information and belief, is appointed to distribute all or substantially all of the same brands of intoxicating liquor in Missouri that Southern Missouri distributes.  Superior is an alter ego of SGWS and Southern Missouri, being entirely controlled by them and having no independent existence apart from them.

4.     Defendant Southern Missouri is a limited liability company organized and existing under the laws of the State of Missouri, with its principal place of business located at 1 Glazer Way, St. Charles, Missouri 63301.  Southern Missouri is a licensed wholesale distributor of intoxicating liquor products in the State of Missouri and is a part of the Southern wholesale distribution network in the State of Missouri.

5.     Defendant SGWS is, upon information and belief, a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 1600 NW 163rd Street, Miami, Florida 33169.

6.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

---

[1] Major Brands recognizes the Court's dismissal of Superior, but names Superior merely for the purposes of preserving its right to appeal dismissal of that party and the denial of Major Brands' Motion to Remand.

7.     Venue is proper in the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to these claims occurred in this district.

### GENERAL ALLEGATIONS

8.     Major Brands is a wholesaler licensed in the State of Missouri, under the provisions of Chapter 311 of the Revised Statutes of Missouri, to sell intoxicating liquor to retailers licensed in the State of Missouri.

9.     Southern Missouri and Superior are wholesalers ostensibly licensed in the State of Missouri under the provisions of Chapter 311 of the Revised Statutes of Missouri, to sell intoxicating liquor to retailers licensed in the State of Missouri, and compete with Major Brands, but now "Southern Missouri" represents to the Court that it is a Florida and Texas company.

10.    Jägermeister is a manufacturer whose brands of intoxicating liquor must be distributed through duly-licensed wholesalers in the State of Missouri.

11.    Major Brands had a longstanding oral agreement of continuing indefinite duration with Jägermeister for decades, whereby Jägermeister granted Major Brands the exclusive rights to offer, sell, and distribute within the State of Missouri certain brands of spirits (the "Brands") and Major Brands for decades did offer, sell and distribute those Brands of spirits within the State of Missouri (the "Distribution Agreement"), creating demand and value for those Brands in this State. As part of that longstanding oral agreement Jägermeister also granted Major Brands the right to use its trademarks in the State of Missouri, which Major Brands did so use in compliance with Jägermeister's instructions.

12.    Under the understood terms of the oral Distribution Agreement, which was based on the ongoing pattern and practice of the dealings between the parties and which guided the

parties' relationship for decades, Jägermeister could not terminate the parties' relationship without first establishing good cause.

13.     Separate and apart from the understood terms of the oral Distribution Agreement, under Missouri's Franchise law [Mo. Rev. Stat. § 407.400, *et. seq.*], Jägermeister could only terminate the Distribution Agreement and Major Brands' rights to distribute the Brands after first establishing "good cause" for the termination, as that term is defined in Section 407.413.5 of the Revised Statutes of Missouri.

14.     Mo. Rev. Stat. § 407.413.2 provides: "Notwithstanding the terms, provisions and conditions of any franchise, no supplier shall unilaterally terminate or refuse to continue or change substantially the condition of any franchise with the wholesaler unless the supplier has first established good cause for such termination, noncontinuance or change."

15.     Pursuant to the Distribution Agreement with Jägermeister, and with Jägermeister's full knowledge and encouragement, Major Brands has made substantial investments in the marketing and distribution of the Brands, and has built up and developed goodwill over the decades for those products throughout the State of Missouri.  Major Brands' investments include, without limitation, significant expenditures of time, money, and human resources.

16.     As but one example, Major Brands hired and trained a Jägermeister Brand Specialist whose exclusive focus was the marketing and distribution of Jägermeister's Brands within Major Brands' top accounts in the Columbia, Missouri market.  Major Brands' Jägermeister Brand Specialist, who was chosen for the job, in part, due to his established relationships with on-premise accounts (bars and restaurants) in Columbia, provided accounts in Missouri with brand education, on-premise and off-premise (grocery stores, liquor stores, etc.) activations, and

consumer samplings.  Additionally, the Jägermeister Brand Specialist increased brand awareness within Major Brands' larger sales force to drive sales of the Jägermeister Brands in Missouri.

17.     Major Brands' Jägermeister Brand Specialist served approximately 40 accounts in the Columbia market, and would perform samplings with new Jägermeister cocktails and facilitate special holiday and game-day promotions in on-premise accounts.

18.     Major Brands' Jägermeister Brand Specialist extolled Jägermeister's products to bartenders and retailers in Missouri and instructed them about Jägermeister's products and the use of those products in unique drink recipes.  He also set up displays and posters in on-premise locations, educated bartenders on the use of Jägermeister's shot machines and shot glass freezers, supported key activations, promoted Jägermeister's products on social media, and worked closely with Major Brands' on-premise sales representatives to facilitate and fill orders.  The Major Brands Missouri Jägermeister Brand Specialist also coordinated directly with, and provided weekly reports to, Jägermeister's State Manager.

19.     Major Brands both trained the Jägermeister Brand Specialist directly and worked with Jägermeister to ensure he was provided with extensive education and training on Jägermeister's products, enabling him to promote those products to retailers throughout Missouri.

20.     Among other things, the Missouri Jägermeister Brand Specialist was trained on the history of Jägermeister, and its products; Jägermeister's future plans for its Brands; different cocktails that could be made using the Brands; the sale and use of Jägermeister shot machines, speed-pour machines, and shot glass freezers; and Jägermeister's expectations moving forward. This education and training was unique to the Jägermeister Brands and is of no utility now that Jägermeister has terminated the Distribution Agreement.  Indeed, the Jägermeister Brand Specialist position had to be eliminated upon Jägermeister's unlawful termination of Major

Brands, and the individual that had filled that position had to be completely retrained, as his product knowledge was limited to the Jägermeister Brands.

21.     In addition to the Jägermeister Brands Specialist, Major Brands' sales representatives made countless sales calls on their numerous retail accounts several times a week, helping Missouri retailers with Jägermeister trademark branding, point-of-sale material, promotional events, and building displays, specific to the Jägermeister Brands.

22.     Major Brands made substantial marketing investments year after year in the Brands, and provided marketing support for those products in the retail trade – including displays, drink promotions, and special events.

23.     In one year alone, Major Brands invested hundreds of thousands of dollars in marketing and promoting Jägermeister's products.  These investments included incentives for sales representatives, local marketing activities, point-of-sale and print promotions, and contributions to Jägermeister's marketing fund.  For example, Major Brands reinvested six dollars and fifty cents per every case of Jägermeister sold—with a smaller portion per case going to Jägermeister's national marketing fund and the majority portion per case allocated to Major Brands' local Jägermeister marketing fund in Missouri.  Jägermeister would often work with and direct Major Brands as to how it wanted the local marketing fund to be utilized in Missouri (e.g., shot machines, promotions, etc.).

24.     Major Brands also made innumerable incremental investments in Jägermeister through price reductions in the retail market.  For example, at Jägermeister's urging, Major Brands "posted" prices for different sizes of Jägermeister's products, cutting its margins to drive key prices in the market and improve sales in Missouri.

25.     In furtherance of the parties' common interest in marketing the Jägermeister Brands, Major Brands purchased Jägermeister shot glass freezers, Jägermeister speed-pour machines, and Jägermeister tap machines, and in turn sold these items to retailers in the Missouri market to assist Jägermeister in meeting its Machine Key Performance Indicator goals.  Major Brands was asked by Jägermeister to make these franchise-specific investments, and was indeed required to make these franchise-specific investments in order to promote Jägermeister's Brands under the Distribution Agreement.  Major Brands sold the Jägermeister equipment at cost, without making any profit.

26.     Major Brands promoted the Jägermeister Brands at numerous Missouri special events, including the Soulard Oktoberfest, July 4 celebrations, St. Louis Mardi Gras, several Halloween events, and numerous other holiday events.  Major Brands also performed local Missouri market blitzes.

27.     Additionally, Major Brands made many franchise-specific investments in its relationship with Jägermeister, including by destroying approximately 1,000 cases of Spiced Jägermeister at Jägermeister's request, and at a cost of $81,000.00.

28.     At Jägermeister's request, Major Brands took on excess inventory of Jägermeister products (covering 100 days of demand) in an effort to help its partner boost its sales figures.  Major Brands also facilitated Jägermeister's hiring of one of Major Brands' best sales managers to become its State manager.

29.     Major Brands' relationship with Jägermeister was viewed as a partnership, and Major Brands' sales team was active in looking for opportunities to sell Jägermeister's Brands and add value to and promote the Brands.  Indeed, the parties were truly interdependent, as Jägermeister could not sell the Brands in Missouri without a licensed wholesaler, and Major

Brands depended on Jägermeister to supply trademarks, the Brands, and provide market insights and direction, among other things.

30.     Major Brands was in weekly, and sometimes daily, contact with Jägermeister to discuss sales, strategies, promotions, and to obtain and provide feedback.

31.     Major Brands instituted unique and interactive programming for Jägermeister in Missouri.  For example, at Jägermeister's insistence, Major Brands purchased a "Cash Grab Machine" for use in incentivizing its sales representatives to sell more Jägermeister products.  The "Cash Grab Machine" was emblazoned with Jägermeister's trademark logos, and filled with "Jägermeister dollars" created by Major Brands' graphics department.  Sales representatives who sold the most Jägermeister products in any given quarter were awarded with time in the "Cash Grab Machine" to collect as many "Jägermeister dollars" as they could, which would in turn be redeemed for cash or gifts.

32.     Additionally, Major Brands conducted the National Wolfenbuttel bus training program in its parking lot to provide its Missouri sales force and all office personnel with training on the Jägermeister Brands.  Major Brands also transported buyers from across Missouri to St. Louis to participate in the bus training program and learn more about Jägermeister's products.

33.     Major Brands expended extensive amounts of time and effort in recruiting, training, and educating employees on Jägermeister's products.  For example, Major Brands would use sales meetings to educate its sales force on Jägermeister's products, new Missouri marketing campaigns, and Jägermeister cocktail recipes.  This training was specific to Jägermeister, and became useless to Major Brands and its employees upon Jägermeister's unlawful termination of the Distribution Agreement.

34.     Both Major Brands and Jägermeister worked as partners to achieve the common goal of growing the goodwill and sales of Jägermeister's products in Missouri, and the parties mutually benefitted from each other's marketing efforts.

35.     In furtherance of the shared partnership between Jägermeister and Major Brands, Jägermeister granted to Major Brands a license to use its trade name, trademarks, service marks, or related characteristics in Missouri for the promotion of Jägermeister's products and brand.

36.     For example, with Jägermeister's permission and encouragement, Major Brands frequently used the Jägermeister trademarks in order to sell and develop goodwill in Missouri for the Jägermeister Brands through custom promotional materials, including on delivery trucks, in point-of-sale materials, on signage, in flyers, on Major Brands' website, at festivals, at promotional and sampling events, on the clothes of Major Brands' representatives, on social media, and in other advertisements directed to both liquor retailers and consumers in Missouri.

37.     In many of the described instances in which Major Brands used Jägermeister's marks, the same promotional material also included Major Brands' name and/or logo, creating a perception to customers and the consuming public of the close relationship between Jägermeister and Major Brands and presenting Major Brands as Jägermeister's exclusive authorized dealer and not a mere re-seller of Jägermeister's products, examples of which are shown below:









38.     Further showing the close partnership between the Jägermeister and Major Brands, the Major Brands Missouri Jägermeister Brand Specialist even included both Jägermeister and Major Brands in his signature block:



39.     Indeed, Major Brands used Jägermeister's trademarks in Missouri not only to sell Jägermeister's products, but also to develop goodwill in Missouri for the Jägermeister brand, which did not substantially exist before Major Brands' efforts.

40.     To facilitate Major Brands' use of the Jägermeister trademarks in Missouri, Jägermeister granted Major Brands access to its trademarks through its online image library, which Major Brands regularly used in advertising and promoting the Jägermeister brand and products in Missouri. This secure online trademark and image library, which was password-restricted, contained numerous Jägermeister trademark and logo variations and layouts; templates; bottle shots; slogans; and taglines.   In addition to the secure online trademark and image library, Jägermeister's State Manager would e-mail updated Jägermeister trademarks and images to Major Brands for use in Missouri marketing and promotion.

41.     In using Jägermeister's trademarks, Major Brands was required to, and did, comply with certain restrictions imposed by Jägermeister regarding use of its marks.  For example, Jägermeister provided Major Brands with Brand Guidelines for use of the marks (e.g., what color logos could be used; what colors not to use; basic templates to use; fonts available to use; and different instructions for complying with Jägermeister's branding restrictions).

42.     Major Brands constructed value-added packaging in which it co-packaged Jägermeister products with t-shirts, and cross-promoted Jägermeister products with its in-house IBC Root Beer as part of Jägermeister's Root Beer Barrel program.

43.     On February 13, 2018, Jägermeister told Major Brands that it was purporting to terminate the Distribution Agreement.  Jägermeister did not provide any reasonable grounds for the purported termination that would constitute "good cause" under Section 407.413.5 of the Revised Statutes of Missouri.  Jägermeister admitted that the purported termination had "nothing to do with Major Brands' performance," but was only the result of Jägermeister's desire to consolidate its distribution nationally with Southern.

44.     Southern was aware of Major Brands' long term relationship with Jägermeister, due to Major Brands' many efforts to promote the Brands throughout the State.

45.     Southern (including SGWS, Southern Missouri, and Superior) is aware of Missouri's Franchise law and willfully and purposefully induced Jägermeister to violate Missouri law.

46.     Southern induced Jägermeister to terminate Major Brands so it could take from Major Brands all the goodwill that Major Brands had created in Missouri.  Jägermeister's attempt to terminate Major Brands as a wholesaler, after Major Brands has built up the sales and

15

Jägermeister brand over decades, without establishing good cause violates Missouri's Franchise law [Mo. Rev. Stat. § 407.400, *et. seq.*], and, therefore, any purported termination is null and void.

<u>**Count I**</u>
<u>**Declaratory Judgment**</u>

47.    Major Brands incorporates its allegations set forth above as though fully set forth herein.

48.    The Declaratory Judgment Act [28 U.S.C. § 2201, *et seq.*] permits any court of the United States to declare the rights and other legal relations of any interested party seeking such declaration.

49.    A present and justiciable controversy exists between Major Brands and Jägermeister regarding whether Jägermeister has a right to terminate Major Brands as a wholesaler under applicable law.

50.    Specifically, Jägermeister has no right to terminate Major Brands as a wholesaler without first establishing good cause and, therefore, Jägermeister's attempted termination violates Missouri's Franchise law [Mo. Rev. Stat. § 407.400, *et. seq.*].

51.    Major Brands' relationship with Jägermeister over the decades constitutes a "franchise" as that term is defined in Mo. Rev. Stat. § 407.400(1) because it is an arrangement for an indefinite period, in which Jägermeister granted to Major Brands a license to use its trade name, trademark, service mark, or related characteristic, and in which Major Brands and Jägermeister have a community of interest in the marketing of the Brands at wholesale.

52.    Alternatively, Major Brands' relationship with Jägermeister constitutes a "franchise" as that term is defined in Mo. Rev. Stat. § 407.400(1) because it is a commercial relationship of continuing indefinite duration between a wholesaler and a supplier wherein Major

Brands was granted the right to offer, sell, and distribute within the State of Missouri the Brands of intoxicating liquor.

53.     Under Mo. Rev. Stat. § 407.413.2:

[N]o supplier shall unilaterally terminate or refuse to continue or change substantially the condition of any franchise with the wholesaler unless the supplier has first established good cause for such termination, noncontinuance or change.

54.     Jägermeister's unilateral termination of Major Brands' franchise without first establishing good cause for such termination violates Section 407.413.2.

55.     The desire to consolidate distribution nationally is not "good cause" as that term is defined in Missouri alcohol distribution laws established to protect Missouri citizens and the public, and Jägermeister's attempted termination violates Missouri's Franchise law [Mo. Rev. Stat. § 407.400, *et. seq*.].

56.     Therefore, any purported termination by Jägermeister of Major Brands as its wholesaler for the Brands must be declared null and void.

WHEREFORE, Plaintiff Major Brands respectfully requests that the Court:

1)      enter judgment in favor of Major Brands and against Defendant Jägermeister on Count I;

2)      enter an order declaring that Defendant Jägermeister has no right to terminate Major Brands as a wholesaler pursuant to the Missouri Franchise law [Mo. Rev. Stat. § 407.413, *et. seq*.] because it has not established good cause for such termination;

3)      enter an order declaring that Defendant Jägermeister's attempted termination of Major Brands as Jägermeister's wholesaler is null, void, and without legal effect; and

4)      provide any other relief that this Court deems just and proper under the circumstances.

## Count II
## Violation of Mo. Rev. Stat. § 407.413

57.     Major Brands incorporates its allegations set forth above as though fully set forth herein.

58.     As alleged above, Major Brands' relationship with Jägermeister constitutes a franchise within the definition of Mo. Rev. Stat. § 407.400, *et seq*.

59.     Jägermeister has violated Mo. Rev. Stat. § 407.413.2 by unilaterally terminating its franchise with Major Brands without first establishing good cause for such termination.

60.     Pursuant to Mo. Rev. Stat. § 407.413.3, "[a]ny wholesaler may bring an action in a court of competent jurisdiction against a supplier for violation of any of the provisions of this section and may recover damages sustained by such wholesaler together with the costs of the action and reasonable attorney's fees."

61.     As a result of the Jägermeister's conduct, Major Brands has sustained damages in excess of $75,000.00.

WHEREFORE, Major Brands prays for a judgment in its favor and against Jägermeister in an amount to be determined at trial, for its costs of bringing this action and reasonable attorneys' fees, for appropriate injunctive relief, and for any other and further relief as this Court deems just and proper.

## Count III
## Breach of Contract

62.     Major Brands incorporates its allegations set forth above as though fully set forth herein.

63.     The Distribution Agreement was at all times and remains, a valid contract supported by adequate consideration.

64.     Under the understood terms of the oral Distribution Agreement, which was based on the ongoing pattern and practice of the dealings between the parties and which guided the parties' relationship for decades, Jägermeister could not terminate the parties' relationship without first establishing good cause.

65.     Major Brands has performed its obligations under the Distribution Agreement.

66.     Jägermeister has breached the terms of the Distribution Agreement by unilaterally terminating the Distribution Agreement without good cause.

67.     Jägermeister's breach of the Distribution Agreement has caused Major Brands to suffer damages in an amount greater than $75,000.00.

WHEREFORE, Major Brands prays for a judgment in its favor and against Jägermeister in an amount to be determined at trial, for its costs of bringing this action, and for any other and further relief as this Court deems just and proper.

<u>**Count IV**</u>
<u>**Breach of the Covenant of Good Faith and Fair Dealing**</u>

68.     Major Brands incorporates its allegations set forth above as though fully set forth herein.

69.     Major Brands has performed its obligations under the Distribution Agreement.

70.     As part of the Distribution Agreement, Jägermeister agreed it would not terminate Major Brands as a distributor of certain brands of Jägermeister's spirits unless it could establish good cause for such termination.

71.     The law implies a covenant of good faith and fair dealing into the terms of the Distribution Agreement, including prohibiting the unilateral termination of Major Brands without good cause and the taking of the goodwill Major Brands had built up for Jägermeister.

72.     Jägermeister has breached the covenant of good faith and fair dealing by unilaterally terminating its Distribution Agreement with Major Brands without good cause.

73.     As a result of Jägermeister's breach of the covenant of good faith and fair dealing, Major Brands has suffered damages in an amount greater than $75,000.00.

WHEREFORE, Major Brands prays for a judgment in its favor and against Jägermeister in an amount to be determined at trial, for its costs of bringing this action, and for any other and further relief as this Court deems just and proper.

### Count V
### Recoupment

74.     Major Brands incorporates its allegations set forth above as though fully set forth herein.

75.     Over decades and with the full knowledge, encouragement, and insistence of Jägermeister, Major Brands, in reliance upon the Distribution Agreement and in good faith, has incurred expense and devoted time and labor to create goodwill for, market and distribute Jägermeister's brands of spirits.

76.     Major Brands has not had sufficient opportunity to recoup the value of its expenditures, its time and its labor from its efforts to market and distribute the Brands.

77.     Accordingly, in the event Jägermeister's termination of the Distribution Agreement is upheld, Jägermeister and Southern, which took the benefits, should be required to compensate Major Brands in an amount adequate to give Major Brands value for the expense, time and labor incurred on behalf of the Brands, which amount is greater than $75,000.00.

WHEREFORE, Major Brands prays for a judgment in its favor and against Jägermeister and the Southern defendants—including SGWS, Southern Missouri, and Superior—in an amount

to be determined at trial, for its costs of bringing this action, and for any other and further relief as this Court deems just and proper.

**Count VI**
**Unjust Enrichment**

78.    Major Brands incorporates its allegations set forth above as though fully set forth herein.

79.    Major Brands has expended substantial money, time and labor in, among other things, creating goodwill, marketing and distributing Jägermeister's brands of spirits in the State of Missouri.

80.    Major Brands' efforts have conferred substantial benefits upon Jägermeister.

81.    Further, Jägermeister had full knowledge of Major Brands' efforts, which Jägermeister encouraged and sometimes insisted on, and Jägermeister fully appreciates the fact of such benefits.

82.    Allowing Jägermeister and Southern to accept and retain the benefits conferred upon it by Major Brands' efforts without adequate payment to Major Brands for those benefits would be inequitable.

83.    Accordingly, the Court should order payment from Jägermeister and Southern, which took the benefits, to Major Brands in an amount sufficient to account for the value of the benefits conferred upon Jägermeister and Southern by Major Brands, which amount is greater than $75,000.00.

WHEREFORE, Major Brands prays for a judgment in its favor and against Jägermeister and the Southern defendants—including SGWS, Southern Missouri, and Superior—in an amount to be determined at trial, for its costs of bringing this action, and for any other and further relief as this Court deems just and proper.

<u>**Count VII**</u>
<u>**Tortious Interference (Against Jägermeister)**</u>

84.     Major Brands incorporates its allegations set forth above as though fully set forth herein.

85.     Major Brands had a valid business expectancy in the distribution of the Brands to numerous retailers licensed to sell intoxicating liquor within the State of Missouri.  Major Brands' relationships with these retailers are independent of its Distribution Agreement with Jägermeister, and were formed through years of relationship-building and commercial sales of beer, wine, and spirits.  Some of these retailer relationships pre-dated Major Brands' distribution of the Jägermeister Brands.  Indeed, Major Brands continues to distribute products other than Jägermeister to these retailers today.  Nevertheless, Major Brands had a valid business expectancy that it would indefinitely continue to distribute the Jägermeister Brands to these retailers.

86.     Jägermeister was aware of Major Brands' business expectancy in the continued distribution of the Brands to such retailers.

87.     Jägermeister intentionally interfered with said business expectancy by terminating Major Brands' Distribution Agreement.

88.     Jägermeister was not justified in interfering with, and used improper means to interfere with, said business expectancy.

89.     Jägermeister's tortious interference was intentional, wanton, willful, outrageous, deliberate, done with an evil motive, and in reckless disregard and indifference to the interests and rights of Major Brands, thus warranting an award of punitive damages in a fair and reasonable amount to be determined at trial.

90.     Major Brands has suffered damages in an amount greater than $75,000.00 as a result of Jägermeister's intentional interference with Major Brands' business expectancy.

WHEREFORE, Major Brands prays for a judgment in its favor and against Jägermeister in an amount to be determined at trial, including an award of punitive damages, and for its costs of bringing this action and for any other and further relief as this Court deems just and proper.

**Count VIII**
**Tortious Interference (Against Southern)**

91.     Major Brands incorporates its allegations set forth above as though fully set forth herein.

92.     Major Brands has both a valid Distribution Agreement with Jägermeister whereby it was granted the rights to offer, sell, and distribute within the State of Missouri certain of Jägermeister's Brands, and a valid business expectancy in the continued distribution of the Brands to numerous Missouri retailers.

93.     Southern was and is aware of Major Brands' Distribution Agreement with Jägermeister and was and is aware of Major Brands' protected franchise rights, contract rights, and business expectancy in its continued distribution of the Brands to retailers.

94.     Southern (and others) intentionally interfered with said protected franchise rights, contract rights, and business expectancy by inducing Jägermeister to breach its Distribution Agreement with Major Brands and violate Missouri's Franchise Law by terminating its Distribution Agreement with Major Brands without good cause.

95.     Southern was not justified in interfering with, and used improper means to interfere with, said protected franchise rights, contract rights, and business expectancy.

96.     Major Brands has been damaged in an amount greater than $75,000.00 as a result of Southern's intentional interference with Major Brands' franchise rights, contract rights, and business expectancy.

97.     Southern's actions in interfering with Major Brands' franchise rights, contract rights, and business expectancy were intentional, wanton, willful, outrageous, deliberate, done with an evil motive, and in reckless disregard and indifference to the interests and rights of Major Brands, thus warranting an award of punitive damages in a fair and reasonable amount to be determined at trial.

WHEREFORE, Major Brands prays for a judgment in its favor and against the Southern defendants—including SGWS, Southern Missouri, and Superior—in an amount to be determined at trial, including an award of punitive damages, and for its costs of bringing this action and for any other and further relief as this Court deems just and proper.

## Count IX
## Civil Conspiracy

98.     Major Brands incorporates its allegations set forth above as though fully set forth herein.

99.     Major Brands has valid protected Missouri franchise rights with Jägermeister whereby it was granted the exclusive rights to offer, sell, and distribute within the State of Missouri certain of Jägermeister's Brands to numerous Missouri retailers.  Major Brands also has rights in the goodwill, customer and consumer demand and expectations, created by Major Brands through its decades of selling Jägermeister's Brands in Missouri.

100.     Southern was and is aware of Major Brands' protected Missouri rights with Jägermeister in its continued distribution of the Brands to retailers.

101.     Southern and Jägermeister (and others) conspired to intentionally violate said protected Missouri rights by illegally terminating Jägermeister's Distribution Agreement with Major Brands, violating Missouri's Franchise Law without good cause, and taking for themselves

the value of the goodwill, customer and consumer demand and expectations created by Major Brands.

102.     Southern and Jägermeister were not justified in conspiring to violate Major Brands' protected Missouri rights.

103.     Major Brands has been damaged in an amount greater than $75,000.00 as a result of Southern and Jägermeister's improper actions in violation of Missouri law.

104.     Southern and Jägermeister's actions in violation of Missouri law were intentional, wanton, willful, outrageous, deliberate, done with an evil motive, and in reckless disregard and indifference to the interests and rights of Major Brands, thus warranting an award of punitive damages in a fair and reasonable amount to be determined at trial.

WHEREFORE, Major Brands prays for a judgment in its favor and against the Southern defendants—including SGWS, Southern Missouri, and Superior—and Jägermeister in an amount to be determined at trial, including an award of punitive damages, and for its costs of bringing this action and for any other and further relief as this Court deems just and proper.

Respectfully submitted,

**LEWIS RICE LLC**

By: /s/   Evan Z. Reid
     Richard B. Walsh, Jr., #33523MO
     Evan Z. Reid, #51123MO
     Oliver H. Thomas, #60676MO
     600 Washington Avenue, Suite 2500
     St. Louis, Missouri 63101
     (314) 444-7722
     (314) 612-7722 (facsimile)
     rwalsh@lewisrice.com
     ereid@lewisrice.com
     othomas@lewisrice.com

*Attorneys for Plaintiff Major Brands, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 22, 2019, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, and that notice of this filing will be sent to counsel of record for the parties by operation of the Court's electronic filing system.

/s/    Evan Z. Reid