UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MAJOR BRANDS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:18CV423 HEA |
| | ) | |
| MAST-JÄGERMEISTER US, INC., | ) | |
| MAST-JÄGERMEISTER US HOLDING, | ) | |
| INC., SOUTHERN GLAZER'S WINE | ) | |
| AND SPIRITS OF MISSOURI, LLC, | ) | |
| SUPERIOR WINES AND LIQUORS, INC.,| ) | |
| and SOUTHERN GLAZER'S WINE AND | ) | |
| SPIRITS, LLC | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendant Mast-Jägermeister US, Inc.'s

Motion to Dismiss Second Amended Complaint, [Doc. No. 138] and Defendants

Southern Glazer's Wine and Spirits of Missouri, LLC, Southern Glazer's Wine and

Spirits, LLC and Superior Wine and Liquors, Inc.'s Motion to Dismiss, [Doc. No.

141]. Plaintiff opposes the Motions. For the reasons set forth below, the Motion

with respect to Superior will be granted. Defendant Mast-Jägermeister US, Inc.'s

Motion to Dismiss Second Amended Complaint will be denied. Defendants

Southern Glazer's Wine and Spirits of Missouri, LLC, Southern Glazer's Wine and

Spirits, LLC's Motion will be granted in part and denied in part.

**Facts and Background**

Plaintiff alleges the following facts.[1]

Major Brands is a wholesaler licensed in the State of Missouri, under the provisions of Chapter 311 Mo.Rev.Stat., to sell intoxicating liquor to retailers licensed in the State of Missouri.

Southern Missouri and Superior[2] are wholesalers ostensibly licensed in the State of Missouri under the provisions of Chapter 311 Mo.Rev.Stat., to sell intoxicating liquor to retailers licensed in the State of Missouri, and compete with Major Brands, but now "Southern Missouri" represents to the Court that it is a Florida and Texas company.

Jägermeister is a manufacturer whose brands of intoxicating liquor are distributed through duly-licensed wholesalers in the State of Missouri.

Major Brands had a longstanding oral agreement of continuing indefinite duration with Jägermeister for decades, whereby Jägermeister granted Major Brand the exclusive rights to offer, sell, and distribute within the State of Missouri certain

---

[1] The recitation of facts is set forth for the purposes of the pending motions only. It in no way relieves the parties of the necessary proof of the facts in later proceedings.

[2] In its Opinion, Memorandum and Order of November 15, 2018, the Court dismissed Superior as having been fraudulently joined in this action. Plaintiff has notified the Court that it has included Superior in the Second Amended Complaint merely for the purposes of preserving its right to appeal the dismissal and denial of its Motion to remand. For the reasons articulated in the November 15, 2018 Opinion, the claims against Superior are again dismissed.

brands of spirits (the "Brands") and Major Brands has for decades offered, sold and distributed those Brands of spirits within the State of Missouri (the "Distribution Agreement") creating demand and value for those Brands in this State. As part of that longstanding oral agreement Jägermeister also granted Major Brands the right to use its trademarks in the State of Missouri, which Major Brands did so use in compliance with Jägermeister's instructions.

Under the understood terms of the oral Distribution Agreement, which was based on the ongoing pattern and practice of the dealings between the parties and which guided the parties' relationship for decades, Jägermeister could not terminate the parties' relationship without first establishing good cause.

Separate and apart from the understood terms of the oral Distribution Agreement under Missouri's Franchise law [Mo.Rev.Stat. § 407.400, *et seq.*], Jägermeister could only terminate the Distribution Agreement and Major Brands' rights to distribute the Brands after first establishing "good cause" for the termination, as that term is defined in Mo.Rev.Stat. § 407.413.5.

Pursuant to the Distribution Agreement with Jägermeister, and with Jägermeister's full knowledge and encouragement, Major Brands has made substantial investments in the marketing and distribution of the Brands, and has built up and developed goodwill over the decades for those products throughout

the State of Missouri. Major Brands' investments include, without limitation, significant expenditures of time, money, and human resources.

Plaintiff further alleges that under Missouri's Franchise law [Mo. Rev. Stat. § 407.400, *et. seq.*] and as part of the Distribution Agreement, Jägermeister may only terminate the Distribution Agreement and Major Brands' rights to distribute the Brands after first establishing "good cause" for the termination, as that term is defined in Section 407.413.5 of the Revised Statutes of Missouri.

For example, Major Brands hired and trained a Jägermeister Brand Specialist whose exclusive focus was the marketing and distribution of Jägermeister's Brands within Major Brands' top accounts in the Columbia, Missouri market. Major Brands' Jägermeister Brand Specialist, who was chosen for the job, in part, due to his established relationships with on-premise accounts (bars and restaurants) in Columbia, provided accounts in Missouri with brand education, on-premise and off-premise (grocery stores, liquor stores, etc.) activations, and consumer samplings. Additionally, the Jägermeister Brand Specialist increased brand awareness within Major Brands' larger sales force to drive sales of the Jägermeister Brands in Missouri. Major Brands' Jägermeister Brand Specialist served approximately 40 accounts in the Columbia market, and would perform samplings with new Jägermeister cocktails and facilitate

special holiday and game-day promotions in on-premise accounts. Major Brands' Jägermeister Brand Specialist extolled Jägermeister's products to bartenders and retailers in Missouri and instructed them about Jägermeister's products and the use of those products in unique drink recipes. He also set up displays and posters in on-premise locations, educated bartenders on the use of Jägermeister's shot machines and shot glass freezers, supported key activations, promoted Jägermeister's products on social media, and worked closely with Major Brands' on-premise sales representatives to facilitate and fill orders. The Major Brands Missouri Jägermeister Brand Specialist also coordinated directly with, and provided weekly reports to, Jägermeister's State Manager.

Major Brands both trained the Jägermeister Brand Specialist directly and worked with Jägermeister to ensure he was provided with extensive education and training on Jägermeister's products, enabling him to promote those products to retailers throughout Missouri. Among other things, the Missouri Jägermeister Brand Specialist was trained on the history of Jägermeister, and its products; Jägermeister's future plans for its Brands; different cocktails that could be made using the Brands; the sale and use of Jägermeister shot machines, speed-pour machines, and shot glass freezers; and Jägermeister's expectations moving forward. This education and training was unique to the Jägermeister Brands. The Jägermeister Brand Specialist position had to be eliminated upon Jägermeister's

termination of Major Brands, and the individual that had filled that position had to be completely retrained, as his product knowledge was limited to the Jägermeister Brands.

In addition to the Jägermeister Brands Specialist, Major Brands' sales representatives made countless sales calls on their numerous retail accounts several times a week, helping Missouri retailers with Jägermeister trademark branding, point-of-sale material, promotional events, and building displays, specific to the Jägermeister Brands.

Major Brands made substantial marketing investments year after year in the Brands, and provided marketing support for those products in the retail trade – including displays, drink promotions, and special events. In one year alone, Major Brands invested hundreds of thousands of dollars in marketing and promoting Jägermeister's products. These investments included incentives for sales representatives, local marketing activities, point-of-sale and print promotions, and contributions to Jägermeister's marketing fund. For example, Major Brands reinvested six dollars and fifty cents per every case of Jägermeister sold—with a smaller portion per case going to Jägermeister's national marketing fund and the majority portion per case allocated to Major Brands' local Jägermeister marketing fund in Missouri. Jägermeister would often work with and direct Major

Brands as to how it wanted the local marketing fund to be utilized in Missouri (e.g., shot machines, promotions, etc.).

Major Brands also made innumerable incremental investments in Jägermeister through price reductions in the retail market. For example, at Jägermeister's urging, Major Brands "posted" prices for different sizes of Jägermeister's products, cutting its margins to drive key prices in the market and improve sales in Missouri.

In furtherance of the parties' common interest in marketing the Jägermeister Brands, Major Brands purchased Jägermeister shot glass freezers, Jägermeister speed-pour machines, and Jägermeister tap machines, and in turn sold these items to retailers in the Missouri market to assist Jägermeister in meeting its Machine Key Performance Indicator goals. Major Brands was asked by Jägermeister to make these franchise-specific investments, and was indeed required to make these franchise-specific investments in order to promote Jägermeister's Brands under the Distribution Agreement. Major Brands sold the Jägermeister equipment at cost, without making any profit.

Major Brands promoted the Jägermeister Brands at numerous Missouri special events, including the Soulard Oktoberfest, July 4 celebrations, St. Louis Mardi Gras, several Halloween events, and numerous other holiday events. Major Brands also performed local Missouri market blitzes.

Additionally, Major Brands made many franchise-specific investments in its relationship with Jägermeister, including by destroying approximately 1,000 cases of Spiced Jägermeister at Jägermeister's request, and at a cost of $81,000.00.

At Jägermeister's request, Major Brands took on excess inventory of Jägermeister products (covering 100 days of demand) in an effort to help its partner boost its sales figures.

Major Brands also facilitated Jägermeister's hiring of one of Major Brands' best sales managers to become its State manager.

Major Brands' relationship with Jägermeister was viewed as a partnership, and Major Brands' sales team was active in looking for opportunities to sell Jägermeister's Brands and add value to and promote the Brands. Indeed, the parties were truly interdependent, as Jägermeister could not sell the Brands in Missouri without a licensed wholesaler, and Major Brands depended on Jägermeister to supply trademarks, the Brands, and provide market insights and direction, among other things.

Major Brands was in weekly, and sometimes daily, contact with Jägermeister to discuss sales, strategies, promotions, and to obtain and provide feedback.

Major Brands instituted unique and interactive programming for Jägermeister in Missouri. For example, at Jägermeister's insistence, Major Brands

purchased a "Cash Grab Machine" for use in incentivizing its sales representatives to sell more Jägermeister products. The "Cash Grab Machine" was emblazoned with Jägermeister's trademark logos, and filled with "Jägermeister dollars" created by Major Brands' graphics department. Sales representatives who sold the most Jägermeister products in any given quarter were awarded with time in the "Cash Grab Machine" to collect as many "Jägermeister dollars" as they could, which would in turn be redeemed for cash or gifts.

Additionally, Major Brands conducted the National Wolfenbuttel bus training program in its parking lot to provide its Missouri sales force and all office personnel with training on the Jägermeister Brands. Major Brands also transported buyers from across Missouri to St. Louis to participate in the bus training program and learn more about Jägermeister's products.

Major Brands expended extensive amounts of time and effort in recruiting, training, and educating employees on Jägermeister's products. For example, Major Brands would use sales meetings to educate its sales force on Jägermeister's products, new Missouri marketing campaigns, and Jägermeister cocktail recipes. This training was specific to Jägermeister and became useless to Major Brands and its employees upon Jägermeister's termination of the Distribution Agreement.

Both Major Brands and Jägermeister worked as partners to achieve the common goal of growing the goodwill and sales of Jägermeister's products in Missouri, and the parties mutually benefitted from each other's marketing efforts.

In furtherance of the shared partnership between Jägermeister and Major Brands, Jägermeister granted to Major Brands a license to use its trade name, trademarks, service marks, or related characteristics in Missouri for the promotion of Jägermeister's products and brand. For example, with Jägermeister's permission and encouragement, Major Brands frequently used the Jägermeister trademarks in order to sell and develop goodwill in Missouri for the Jägermeister Brands through custom promotional materials, including on delivery trucks, in point-of-sale materials, on signage, in flyers, on Major Brands' website, at festivals, at promotional and sampling events, on the clothes of Major Brands' representatives, on social media, and in other advertisements directed to both liquor retailers and consumers in Missouri.

In many of the described instances in which Major Brands used Jägermeister's marks, the same promotional material also included Major Brands' name and/or logo, creating a perception to customers and the consuming public of the close relationship between Jägermeister and Major Brands and presenting Major Brands as Jägermeister's exclusive authorized dealer and not a mere re-seller of Jägermeister's products. The Major Brands Missouri Jägermeister Brand

Specialist included both Jägermeister and Major Brands in his email signature block.

Indeed, Major Brands used Jägermeister's trademarks in Missouri not only to sell Jägermeister's products, but also to develop goodwill in Missouri for the Jägermeister brand, which did not substantially exist before Major Brands' efforts.

To facilitate Major Brands' use of the Jägermeister trademarks in Missouri, Jägermeister granted Major Brands access to its trademarks through its online image library, which Major Brands regularly used in advertising and promoting the Jägermeister brand and products in Missouri. This secure online trademark and image library, which was password-restricted, contained numerous Jägermeister trademark and logo variations and layouts; templates; bottle shots; slogans; and taglines. In addition to the secure online trademark and image library, Jägermeister's State Manager would e-mail updated Jägermeister trademarks and images to Major Brands for use in Missouri marketing and promotion.

In using Jägermeister's trademarks, Major Brands was required to, and did, comply with certain restrictions imposed by Jägermeister regarding use of its marks. For example, Jägermeister provided Major Brands with Brand Guidelines for use of the marks (e.g., what color logos could be used; what colors not to use; basic templates to use; fonts available to use; and different instructions for complying with Jägermeister's branding restrictions).

Major Brands constructed value-added packaging in which it co-packaged Jägermeister products with t-shirts, and cross-promoted Jägermeister products with its in-house IBC Root Beer as part of Jägermeister's Root Beer Barrel program.

On February 13, 2018, Jägermeister told Major Brands that it was purporting to terminate the Distribution Agreement. Jägermeister did not provide any reasonable grounds for the purported termination that would constitute "good cause" under Section 407.413.5 of the Revised Statutes of Missouri. Jägermeister admitted that the purported termination had "nothing to do with Major Brands' performance," but was the result of Jägermeister's desire to consolidate its distribution nationally with Southern.

Southern was aware of Major Brands' long term relationship with Jägermeister due to Major Brands' many efforts to promote the Brands throughout the State.

Southern (including SGWS, Southern Missouri, and Superior) is aware of Missouri's Franchise law and is willfully and purposefully induced Jägermeister to violate Missouri law.

Southern induced Jägermeister to terminate Major Brands so it could take from Major Brands all the goodwill that Major Brands had created in Missouri. Jägermeister's attempt to terminate Major Brands as a wholesaler, after Major Brands has built up the sales and Jägermeister brand over decades, without

establishing good cause violates Missouri's Franchise law [Mo. Rev. Stat. § 407.400, *et. seq.*], and, therefore, any purported termination is null and void.

Count I of the Second Amended Complaint is brought for a declaratory judgment; Count II for a violation of Mo.Rev.Stat. § 407.413; Count III is an alleged breach of contract claim; Count IV is a breach of the covenant of good faith and fair dealing; Count V is brought for recoupment ; Count VI is an unjust enrichment claim; Counts VII and VIII are alleged tortious interference claims; and Count IX is a claim for civil conspiracy.  Defendants move to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## Legal Standard

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). To satisfy this requirement, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Corrado v. Life Inv'rs Ins. Co. of Am.*, 804 F.3d 915, 917 (8th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."

*Zink v. Lombardi*, 783 F.3d 1089, 1098 (8th Cir. 2015) (quoting *Iqbal*, 556 U.S. at

678), *cert. denied*, 135 S. Ct. 2941 (2015). The complaint's factual allegations

must be "sufficient to 'raise a right to relief above the speculative level.'"

*McDonough v. Anoka Cty.*, 799 F.3d 931, 946 (8th Cir. 2015) (quoting *Twombly*,

550 U.S. at 555). The Court must accept factual allegations as true, but it is not

required to accept any "legal conclusion couched as a factual allegation." *Brown v.*

*Green Tree Servicing LLC*, 820 F.3d 371, 373 (8th Cir. 2016) (quoting *Iqbal*, 556

U.S. at 678). Thus, "[a] pleading that offers 'labels and conclusions' or 'a

formulaic recitation of the elements of a cause of action will not do.'" *Ash v.*

*Anderson Merchandisers, LLC*, 799 F.3d 957, 960 (8th Cir. 2015) (quoting *Iqbal*,

556 U.S. at 678), *cert. denied*, 136 S. Ct. 804 (2016).

On a motion to dismiss, courts must rule "on the assumption that all the

allegations in the complaint are true," and "a well-pleaded complaint may proceed

even if it strikes a savvy judge that actual proof of those facts is improbable, and

'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 555, 556

(quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). "Determining whether a

complaint states a plausible claim for relief ... [is] a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense."

*Mickelson v. Cty. of Ramsey*, 823 F.3d 918, 923 (8th Cir. 2016) (alteration in

original) (quoting *Iqbal*, 556 U.S. at 679).

## Discussion

## Defendant Mast-Jägermeister US, Inc.

## Counts I and II

In Count I of its Second Amended Complaint, Plaintiff seeks a declaration that Jägermeister has no right to terminate Plaintiff as a wholesaler pursuant to the Missouri Franchise law, Mo.Rev.Stat. § 407.413, *et seq*. because it has not established good cause for such termination. In Count II, Plaintiff claims Jägermeister has violated Mo.Rev.Stat. § 407.413.2 by terminating its claimed franchise with Major Brands without first establishing good cause for such termination.

Defendant Jägermeister argues that Counts I and II must be dismissed since Plaintiff's lawsuit is dependent upon the existence of a "franchise" between it and Jägermeister, and no such franchise relationship exists.

In its March 12, 2019 Opinion, Memorandum and Order, the Court discussed the applicability of the liquor-specific definition set forth in Mo.Rev.Stat. § 407.400. Plaintiff acknowledges the Court's ruling and only raises the issue to preserve appeal.

Jägermeister once again argues that Plaintiff does not have a trademark license as a matter of law. According to Jägermeister, Plaintiff must show that it used the trade name in such a manner as to create a reasonable belief that there is a

connection between the licensor and licensee. While it may be that Plaintiff will ultimately have to *prove* the existence of the trademark licenses, at this stage of the litigation the Court is required to accept the allegations, and reasonable inferences therefrom, in Plaintiff's Second Amended Complaint as true.

The Missouri Franchise Act defines franchise as:

(1) "Franchise" means a written or oral arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trademark, service mark, or related characteristic, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise, including but not limited to a commercial relationship of definite duration or continuing indefinite duration, between a "wholesaler", such wholesaler being a person as defined in this section, licensed pursuant to the provisions of chapter 311 to sell at wholesale, intoxicating liquor, as defined in section 311.020, to retailers, duly licensed in this state, and a "supplier", being a person engaged in the business as a manufacturer, distiller, rectifier or out-of-state solicitor whose brands of intoxicating liquor are distributed through duly licensed wholesalers in this state, and wherein a wholesaler is granted the right to offer, sell, and distribute within this state or any designated area thereof such of the supplier's brands of intoxicating liquor, or all of them, as may be specified; except that, the term "franchise" shall not apply to persons engaged in sales from warehouses or like places of storage, other than wholesalers as above described, leased departments of retail stores, places of original manufacture, nor shall the term "franchise" apply to a commercial relationship that does not contemplate the establishment or maintenance of a place of business within the state of Missouri. As used herein "place of business" means a fixed, geographical location at which goods, products or services are displayed or demonstrated for sale;
Mo. Ann. Stat. § 407.400 (West)

In the Second Amended Complaint, Plaintiff now sets out factual allegations regarding the parties' relationship. The Second Amended Complaint details the permissive use of the trademarks and what Plaintiff was required to do under the

parties' agreement.  Although Jägermeister argues that Plaintiff merely sets out its

marketing efforts as a distributor alone, the specific details of the parties'

relationship cannot be ascertained under the motion to dismiss standard.

Likewise, Plaintiff's Second Amended Complaint now sufficiently sets out

the required "community of interest."  To determine whether community of

interest exists, a two-part test has been used: "(1) the distributor's investments must

have been substantially franchise-specific, and (2) the distributor must have been

required to make these investments by the parties' agreement or the nature of the

business." *Mo. Beverage Co. Inc. v. Shelton Bros., Inc.*, 669 F.3d 873, 879-880

(8th Cir. 2012)(quoting *Cooper Distrib. Co v. Amana Refrigeration, Inc.*, 63 F.3d.

262, 269 (3d Cir. 1995)) (internal quotation omitted).

The Second Amended Complaint alleges it made Jägermeister specific

investments, for example:  it hired and trained a Brand Specialist, it trained general

employees that was specific to the Brand, it purchased several Brand specific

products.  Viewing these allegations as true, Plaintiff sufficiently sets out a

plausible claim under the Franchise Act.

**Counts III and IV**

Count III, is brought as a claim for breach of contract, and Count IV, breach

of the Covenant of Good Faith and Fair Dealing, are based on an oral distribution

agreement between Plaintiff and Jägermeister.  To state a claim for breach of

contract, Plaintiff must plead 1.) the "existence of a valid contract"; 2.) the "rights and obligations of each party"; 3.) breach; and 4.) damages. *Best Buy Builders, Inc. v. Siegel*, 409 S.W.3d 562, 564 (Mo. App. 2013).

Defendant argues that the contract claims must be dismissed because the Second Amended Complaint fails to set out sufficient elements of a valid contract. Defendant complains that the who, what, when, what course of conduct, what the parties intended by including a "good cause" termination requirement, and what each of the parties' obligations were. Contrary to Defendant's argument, this specific detail is not required at the pleading stage. Plaintiff has alleged a longstanding oral agreement of continuing indefinite duration whereby Jägermeister granted Plaintiff the exclusive rights to offer, sell, and distribute within the State of Missouri certain brands of spirits, which Plaintiff did for decades. Further Jägermeister granted Plaintiff the right to use its trademarks, which Plaintiff did in accordance with Jägermeister's instructions. According to the allegations, the parties' agreement could not be terminated without first establishing good cause. Accepting the factual allegations in the Second Amended Complaint and viewing them in the light most favorable to Plaintiff, Plaintiff has now pled that the Distribution Agreement itself has a "good cause" requirement as one of its terms. This Count now alleges sufficient facts to state an independent claim for breach of contract outside the Franchise Act.

**Statute of Frauds**

Jägermeister also argues that Count III must be dismissed as the alleged contract violates the Statute of Frauds. Missouri's statute of frauds barring enforcement of oral agreements that cannot be performed within one year of being made states:

> No action shall be brought ... to charge any person ... upon any agreement that is not to be performed within one year from the making thereof, unless the agreement upon which the action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith ....

Mo. Rev. Stat. § 432.010. "[A] contract is not unenforceable under the statute of frauds if it could possibly be performed in compliance with its terms within one year, even though the actual performance is expected to continue over a much longer period." *Warren v. Tribune Broad. Co.*, LLC, 512 S.W.3d 860, 866 (Mo. App. W.D. 2017) (internal quotation marks omitted) (quoting *Crabb v. Mid-Am. Dairymen, Inc.*, 735 S.W.2d 714, 716 (Mo. banc 1987)). At this stage in the litigation, when this Court must accept Plaintiff's allegations as true and construe them in its favor, Missouri's statute of frauds does not bar Count III. *W.G. Wade Shows, Inc. v. Spectacular Attractions, Inc.*, No. 6:19-CV-03119-SRB, 2019 WL 3254796, at *2 (W.D. Mo. July 19, 2019).

"Under Missouri law, a duty of good faith and fair dealing is implied in every contract." *Arbors at Sugar Creek Homeowners Ass'n v. Jefferson Bank &*

*Trust Co.*, 464 S.W.3d 177, 185 (Mo. 2015). A breach occurs when the defendant

frustrates the contract by acting in bad faith, for example, by "eva[ding] the spirit

of the bargain, lack of diligence and slacking off, willful rendering of imperfect

performance, abuse of a power to specify terms, and interference with or failure to

cooperate." *Compass Bank v. Eager Rd. Associates, LLC*, 922 F. Supp. 2d 818, 826

(E.D. Mo. 2013) (quoting Restatement (Second) of Contracts § 205 cmt. d).

Defendant argues that Plaintiff fails to state a claim for breach of the implied

covenant of good faith and fair dealing because the oral contract was terminable at

will. As discussed *supra*, Plaintiff has alleged that the parties' agreement included

a 'good cause" requirement for termination. As such, this basis for dismissal is

without merit.

**Counts V and VI**

Defendants move to dismiss Counts V and VI (recoupment and unjust

enrichment, respectively) arguing that in spite of the previous finding that Plaintiff

has stated a claim for recoupment and unjust enrichment, the additional allegations

Plaintiff has alleged establish that such claims fail as a matter of law.

As the Court's Opinion, Memorandum, and Order previously discussed,

under Missouri law, the termination of an at-will agreement may give rise to a

recoupment claim. Specifically, a party may seek "recoupment or [ ] compensation

on a quantum meruit basis where the [party], induced by his appointment, has in

good faith incurred expense and devoted time and labor in the matter of the [relationship] without having had a sufficient opportunity to recoup such expenditures from the undertaking.*" Ernst v. Ford Motor Co.*, 813 S.W.2d 910, 919 (Mo. Ct. App. 1991). A party seeking damages for time and labor must "prov[e] the reasonable value of services performed." *Kinetic Energy Develop. Corp. v. Trigen Energy Corp.*, 22 S.W.3d 691, 697 (Mo. Ct. App. 1999); *see also Sofa Gallery, Inc. v. Stratford Co.*, 872 F.2d 259, 263 (8th Cir. 1989) (recognizing that the plaintiff "bear[s] the burden of proving the extent to which its investments have gone unrecouped").

Plaintiff has alleged it has expended substantial money, time and labor in marketing and distributing Jägermeister brands in Missouri. Plaintiff has sufficiently put Defendant Jägermeister on notice of the claim and the types of damages it claims to have incurred. Plaintiff alleges Defendants benefited from the expenditures and that it would be inequitable for them to retain the benefit of Plaintiff's services without compensation. The mere addition of Southern to this count, however, fails to delineate how the expenditures benefited Southern and what benefits Southern "took.". The expenditures were made in reliance on the Distribution Agreement and with the "full knowledge, encouragement and insistence of Jägermeister. Under the Rule 12(b)(6) standard, Plaintiff has sufficiently stated a recoupment claim as to Jägermeister, but fails as to Southern.

The elements for unjust enrichment are: (1) a benefit conferred by one party on another; (2) appreciation or recognition by the receiving party of the fact that what was conferred was a benefit; and (3) acceptance and retention of the benefit that would render that retention inequitable. *Hoeper v. Liley*, 527 S.W.3d 151, 161 (Mo. App. W.D. 2017); *Rental Co, LLC. v. Carter Group, Inc.*, 399 S.W.3d 63, 66 (Mo. App. W.D. 2013); *Cridlebaugh v. Putnam Cty. State Bank of Milan*, 192 S.W.3d 540, 543 (Mo. App. W.D. 2006).

Plaintiff has alleged that it expended substantial money, time and labor in marketing and distributing Defendant's brands in Missouri; Plaintiff alleges that a benefit has been conferred on Defendants, that being the demand and value for Defendant's brands that Plaintiff created in Missouri; and that it would be inequitable for Defendant to retain the benefit of Plaintiff's services without sufficient compensation.

Defendant Jägermeister argues that Plaintiff's unjust enrichment argument fails because the allegations fail to set out what benefit was conferred on Defendant, rather, it only focuses on what Plaintiff did and its expenditures. Jägermeister's argument goes to the substantive issues with respect to Plaintiff's claims. At this stage of the proceedings, the only issues are whether Plaintiff has stated a cause of action. Whether Plaintiff will ultimately be able to prove its allegations is not now before the Court.

With respect to Southern, however, this Count fails. Plaintiff alleges that Jägermeister had full knowledge of Plaintiff's efforts, which Jägermeister encouraged and fully appreciated the fact of the benefits, but merely states that Southern accepted and retained the benefits. Although Plaintiff alleges that Southern induced Jägermeister to terminate the Distribution Agreement so it could "take" the goodwill it created in Missouri, it appears from this allegation that any goodwill established would benefit Jägermeister, not Southern. Count VI will be dismissed as to Southern.

## Counts VII and VIII

Count VII alleges that Jägermeister tortiously interfered with Plaintiff's business expectancy in the distribution of Defendant's brands to numerous retailers.

> The elements of a cause of action for tortious interference with a business expectancy or relationship are: (1) a contract or valid business relationship or expectancy; (2) the defendant's knowledge of the relationship or contract; (3) intentional interference by the defendant causing or inducing a breach of the contract or relationship; (4) the absence of justification; and (5) damages resulting from the conduct of the defendant.
> *Hertz Corp. v. RAKS Hosp., Inc.*, 196 S.W.3d 536, 549 (Mo. App. 2006).

*Lewellen v. Universal Underwriters Ins. Co.*, No. 2019 WL 579635, at *13 (Mo. Ct. App. Feb. 13, 2019).

Plaintiff's Second Amended Complaint sets forth, in pertinent part, the following allegations in support of its tortious interference claim:

Major Brands had a valid business expectancy in the distribution of the Brands to numerous retailers licensed to sell intoxicating liquor within the State of Missouri. Major Brands' relationships with these retailers are independent of its Distribution Agreement with Jägermeister, and were formed through years of relationship-building and commercial sales of beer, wine, and spirits. Some of these retailer relationships pre-dated Major Brands' distribution of the Jägermeister Brands. Indeed, Major Brands continues to distribute products other than Jägermeister to these retailers today. Nevertheless, Major Brands had a valid business expectancy that it would indefinitely continue to distribute the Jägermeister Brands to these retailers.

Plaintiff's allegations withstand the Motion to Dismiss. Assuming the truth of the allegations, Plaintiff has set out enough to notify Defendant of its claim.

Plaintiff has pled agreements which are independent of the Distribution Agreement with Jägermeister. In this claim, Plaintiff does not allege Defendant interfered with the Distribution Agreement, *i.e.*, the agreement between Major Brands and Jägermeister, rather, Plaintiff claims that Jägermeister's termination of the Distribution Agreement interfered with the business expectancy it had with retailers. *See BMK Corp. v. Clayton Corp*., 226 S.W.3d 179 (Mo.App. 2007); *Cole v. Homier Distributing Co., Inc.*, 599 F.3d 856, 861-62 (8th Cir. 2010).

In Count VIII, Plaintiff alleges Southern was and is aware of Plaintiff's Distribution Agreement and the protected franchise rights, contract rights, and business expectancy in the continued distribution of the Brands to retailers. Further, Plaintiff alleges Southern intentionally interfered with the protected franchise rights, contract rights, and business expectancy by inducing Jägermeister

to breach the Distribution Agreement without good cause.  Plaintiff has alleged the Southern Defendants have taken the fruits of Plaintiff's labors in developing brand awareness and all the goodwill that it has created in Missouri.  Indeed, some of the redacted information provided in the sealed documents reveals more specific detail.  The Motion to Dismiss will be denied.

## Counts IX

Plaintiff alleges a claim of civil conspiracy against Jägermeister and the Southern Defendants. Plaintiff contends Defendants had an agreement or a meeting of the minds to commit unlawful acts, and in furtherance of their conspiracy, Defendants committed unlawful acts of violating Plaintiff's protected Missouri rights by illegally terminating the Distribution Agreement, violating Missouri's Franchise Law without good cause and taking for themselves the value of the goodwill, customer and consumer demand and expectations created by Plaintiff. Plaintiff claims it sustained damages as a result of Defendants' alleged conspiracy.

In Missouri, civil conspiracy "is not a separate and distinct action." *W. Blue Print Co. v. Roberts*, 367 S.W.3d 7, 22 (Mo. banc 2012) (citation omitted). Instead, a civil conspiracy claim "acts to hold the conspirators jointly and severally liable for the underlying act." *Id.* (quoting *8000 Md., LLC v. Huntleigh Fin. Servs. Inc.*, 292 S.W.3d 439, 451 (Mo. Ct. App. 2009)). "The gist of the action is not the conspiracy, but the wrong done by acts in furtherance of the conspiracy or

concerted design resulting in damage to plaintiff." *Id.* (citation omitted). To demonstrate the existence of a civil conspiracy, a plaintiff must establish "(1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and (5) [the plaintiff] was thereby damaged." *Id.* (quoting *Oak Bluff Partners, Inc. v. Meyer*, 3 S.W.3d 777, 781 (Mo. banc 1999)).

Defendants argue that Count IX must be dismissed because the basis for the alleged civil conspiracy is the alleged breach of the Missouri Franchise Act, breach of contract and tortious interference of Defendant in Plaintiff's business expectancy with the retailers. Defendants argue that since Plaintiff's underlying claims fail to state a cause of action, the civil conspiracy claim must be dismissed. Since the Court has found Plaintiff has stated claims in its Second Amended Complaint, this basis for dismissal is without merit.

Defendants also argue Plaintiff fails to allege an agreement to commit an unlawful act. To the contrary, Plaintiff has alleged Southern and Jägermeister (and others) conspired to intentionally violate Plaintiff's protected Missouri rights by illegally terminating Jägermeister's Distribution Agreement with Major Brands, violating Missouri's Franchise Law without good cause, and taking for themselves the value of the goodwill, customer and consumer demand and expectations created by Major Brands. Furthermore, Plaintiff has alleged that Jägermeister's

termination was only the result of Jägermeister's desire to consolidate its distribution nationally with Southern, that Jägermeister admitted it terminated the Distribution Agreement without good cause, and that Southern was aware of Missouri's Franchise law and willfully and purposefully induced Jägermeister to violate Missouri law. Accepting these allegations as true, and drawing all reasonable inferences therefrom in the light most favorable to Plaintiff, Count IX sets forth a plausible claim for civil conspiracy.

## Conclusion

Based upon the foregoing, Jägermeister's Motion to Dismiss is denied. Southern Glazier's and Superior's Motion to Dismiss is granted in part and denied in part.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Mast-Jägermeister US, Inc.'s Motion to Dismiss Second Amended Complaint, [Doc. No. 138] is denied.

**IT IS FURTHER ORDERED** that Defendants Southern Glazer's Wine and Spirits of Missouri, LLC, Southern Glazer's Wine and Spirits, LLC and Superior Wine and Liquors, Inc.'s Motion to Dismiss, [Doc. No. 141], is granted in part and denied in part.

**IT IS FURTHER ORDERED** that Superior Wine and Liquors, Inc. is dismissed from this action.

**IT IS FURTHER ORDERED** that Count V and VI are dismissed as to Defendants Southern Glazer Wine and Spirits of Missouri, LLC and Southern Glazer's Wine and Spirits, LLC.

Dated this 15th day of November, 2019.


_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE