**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| MAJOR BRANDS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:18-cv-00423-HEA |
| | ) | |
| MAST-JÄGERMEISTER US, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF MAJOR BRANDS, INC.'S TRIAL BRIEF**

**I.     Summary of the Case**

Defendants intentionally broke Missouri law by terminating without cause (and tortiously

causing the termination of) a decades-long statutorily-protected Missouri liquor franchise

relationship.  This is not a case about milk or hamburgers.  It is about the distribution of alcohol in

the state of Missouri.  Missouri courts have repeatedly stated that liquor is different in the eyes of

the law.  *See State ex rel. Nixon v. Beer Nuts, Ltd.*, 29 S.W.3d 828, 836 (Mo. Ct. App. 2000) ("We

start with the proposition that the liquor business stands on a different plane than other commercial

operations.") (citation omitted) (emphasis added).

Major Brands, Inc. ("Major Brands") introduced Jägermeister's brand to Missouri in the

1970s.  For decades since, Major Brands worked tirelessly to build Jägermeister's brand

throughout the State of Missouri.  Major Brands invested heavily in its partnership with

Jägermeister, devoting significant time, effort, and money towards marketing Jägermeister's

products.  That investment was taken without compensation and admittedly without cause by an

unlawful termination with only a few weeks' notice.  Both parties recognized that their relationship

constituted a protected franchise under the Missouri Liquor Franchise Act, Mo. Rev. Stat. §

407.413, that could only be terminated with statutory good cause first established.  Southern

Glazer's Wine and Spirits of Missouri, LLC and Southern Glazer's Wine and Spirits, LLC (collectively, "Southern"), for its part, knew that Major Brands was the exclusive wholesaler of Jägermeister's products, and that Missouri is a "franchise state" in which liquor wholesalers cannot be terminated without statutory good cause.  Southern intentionally violated Missouri law when it required Jägermeister to terminate its franchise relationship with Major Brands to ████████ ████████████████████████████████████████████████████████████ ████████████████████    ████████████████████████████████ ,  Jägermeister intentionally violated Missouri law, and breached its longstanding contract with Major Brands, when it accepted ████████████████ and terminated Major Brands without the Missouri Liquor Franchise Act's required statutory good cause.

Realizing that the Missouri Liquor Franchise Act prohibits their intentional, wrongful actions, Defendants argue that the Court, and now the jury, can ignore these facts and Missouri law.  Defendants instead urge the Court to hold that the distribution of alcohol in Missouri should be governed and interpreted by the general law of other States for the sale of other (non-alcohol) products.  Defendants argue, in effect, that their actions—unlawful and wrongful under Missouri law—are excusable because Defendants' illicit deal impacted other States and other distributors, too, and thus, a new national standard of liquor distribution should be applied to their conduct.  Of course, such an argument not only ignores Missouri law, but also the Twenty-first Amendment's clear directive for State liquor control.

Defendants' repeated requests throughout this litigation that the Court follow non-liquor case law from other States not only ignores and conflicts with Missouri Supreme Court precedent interpreting the Missouri Liquor Franchise Act, but also results in a standard that prevents a liquor franchise relationship from existing unless that relationship exhibits the very prohibitions that the

three-tiered system was designed to prohibit and guard against: suppliers controlling distribution at the wholesale and retail level.  For example, Defendants have previously argued that Major Brands cannot be a Missouri liquor wholesale franchise because "Plaintiff maintained an independent identity from Jägermeister" and "Jägermeister neither could nor did control Plaintiff's operations. . . ."  (ECF No. 289, at 3–4.)  Of course, such control and unity of identity are exactly what Missouri was prohibiting through the enactment of its three-tier system.

Defendants want this Court to adopt an interpretation of the Missouri Liquor Franchise Act that would require a liquor distributor to destroy the very protections established by the three-tier system.  If Defendants needed a reminder on the important differences between the distribution and sale of liquor and other products, as well as the uniqueness of each State's liquor laws, the Eighth Circuit discussed some of those distinctions and their historical context recently:

> The Eighteenth Amendment, ratified in 1919, was a rather brief experiment with a nationwide ban on the "manufacture, sale, or transportation" of alcohol. The Twenty-first Amendment, ratified in 1933, ended Prohibition. Section 1 of the Twenty-first repealed the Eighteenth Amendment. Section 2, which is central to the issues before us, provides: "The transportation or importation into any State . . . for delivery or use therein of intoxicating liquors, *in violation of the laws thereof*, is hereby prohibited." (Emphasis added.) Acting in response to the Twenty-first Amendment, Missouri promptly enacted the Liquor Control Act. 1933-34 Mo. Laws, Extra Session, pp. 77-95, now codified at Mo. Rev. Stat. Ch. 311. The Act is "a comprehensive scheme for the regulation and control of the manufacture, sale, possession, transportation and distribution of intoxicating liquor."
>
> Prior to Prohibition, some States enacted laws adopting a "three-tiered distribution model." A primary purpose of this model is to prevent a return to "the English 'tied-house' system" in which alcohol producers monopolized distribution from producer to consumer, a system widely perceived as causing or at least contributing to the social ills of excess alcohol consumption and consumption by minors. Under the three-tiered model,
>
>> the producer sells to a licensed in-state wholesaler, who pays excise taxes and delivers the alcohol to a licensed in-state retailer. The

3

retailer, in turn, sells the alcohol to consumers, collecting sales taxes
where applicable.

> *A central feature of the separated tiers is to prohibit a member of one tier from having a financial interest in a member of a higher or lower tier*. In the Liquor Control Act, Missouri -- like many States -- adopted a version of the three-tiered distribution model in implementing its authority under Section 2 of the Twenty-first Amendment.

*Sarasota Wine Mkt., LLC v. Schmitt*, No. 19-1948, 2021 WL 560832, at *1–2 (8th Cir. Feb. 16, 2021) (citations omitted) (emphasis added).  This Court cannot, as Defendants repeatedly request, disregard Missouri's prerogative under the Twenty-first Amendment to implement its own liquor distribution rules and to require a franchise definition that directly conflicts with its chosen three-tier system.

The Missouri Liquor Franchise Act defines a franchise at Mo. Rev. Stat. § 407.400(1) as being "a commercial relationship of definite duration or continuing indefinite duration" between a "supplier" and a "wholesaler," as defined by Chapter 311 of the Revised Statutes, "wherein a wholesaler is granted the right to offer, sell, and distribute within this state or any designated area thereof such of the supplier's brands of intoxicating liquor, or all of them, as may be specified . . ."  Under Mo. Rev. Stat. § 407.413.2, a franchise that meets this specific definition may not be altered, discontinued or terminated by the supplier "unless the supplier has first established good cause for such termination, noncontinuance or change."  Emphasizing further that the burden is on the supplier (Jägermeister here) to show compliance with the statute, the legislature mandated that "[i]n any action brought by a wholesaler against a supplier for termination, noncontinuance or substantial change in violation of the provisions of this section, it is a complete defense for the supplier to prove that the termination, noncontinuance or change was done in good faith and for good cause."  Mo. Rev. Stat. § 407.413.4.  The legislature went on to specify that "good faith"

4

means "the duty of each party to any franchise and all officers, employees or agents thereof to act in a fair and equitable manner towards each other" and then listed a sharply limited set of circumstances that could qualify as "good cause."  Mo. Rev. Stat. § 407.413.5.

The provisions of this Missouri law are not something that Defendants can choose to ignore to suit their purposes.  As Missouri Courts have held, these laws are of "importance to the public policy of the state, evidenced in part by the fact that any effort to waive or modify its provisions is unenforceable[.]" *High Life Sales Co. v. Brown-Forman Corp.*, 823 S.W.2d 493, 499 (Mo. banc 1992); *see also id.* at 497–98 (noting that "the application of § 407.413 . . . involves a matter of important public policy to the state of Missouri," that "[b]oth the general subject of liquor control and the specific statutory protection of a holder of a liquor distribution franchise carry heightened public policy considerations," and that the paternalistic nature of the Missouri Liquor Franchise Act indicates "that it is fundamental policy").

Defendants have repeatedly admitted that Jägermeister had no statutory good cause for the termination.  It is also clear that Jägermeister did not act in good faith, and only terminated Major Brands because of Jägermeister's desire to ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ through termination and consolidation with Southern.  Such an admission significantly narrows the facts necessary to establish Major Brands' Missouri Liquor Franchise Act claims and the relevant evidence for trial.

As this Court is well aware, the issues to be tried in this case should be narrow:  (1) whether Major Brands and Jägermeister had a Missouri liquor franchise relationship; (2) whether Southern tortiously interfered with Major Brands and Jägermeister's relationship; and (3) Major Brands' damages.  However, it is expected that the Defendants will attempt to confuse the jury and obfuscate their deliberate misconduct by unnecessarily converting the trial into a lengthy and

irrelevant forensic examination of Major Brands' relationships with all of its other suppliers, past and present. The focus of the trial should remain on Major Brands' relationship with Jägermeister, Southern's tortious interference in that relationship, and Major Brands' resulting damages.

## II.   Major Brands' Case

### A.   Missouri Liquor Franchise

At the outset of this case and throughout, Major Brands has emphasized that this is not an ordinary commercial dispute. It is a statutory action brought under a law created pursuant to Missouri's Constitutional authority to govern whether and how intoxicating liquor is imported, sold, and distributed in the State. It is no accident that in crafting Mo. Rev. Stat. § 407.400 *et seq.*, the legislature expressly tied the Missouri Liquor Franchise Act to the Liquor Control Act in Chapter 311, Missouri Revised Statutes. In Mo. Rev. Stat. § 311.015, the legislature declared "[t]he provisions of this chapter establish vital state regulation of the sale and distribution of alcohol beverages in order to promote responsible consumption, combat illegal underage drinking, and achieve other important state policy goals such as maintaining an orderly marketplace composed of state-licensed alcohol producers, importers, distributors, and retailers." This case must be tried in full cognizance of the State's powers and the interests it has set forth in the statutes. Put simply, the Defendants cannot be allowed to nullify such an important statute by attempting to rewrite the statute to suit Defendants' desire to make Missouri an open State without any franchise protection, either by pressing a definition that is contrary to statute and case law or by weighing down the trial with sideshows and irrelevancies.

Defendants want to turn this trial into a question of whether Major Brands' relationship with Jägermeister is similar to a McDonalds "franchise." In sharp contrast, under firm Missouri Supreme Court precedent, a franchise relationship is formed between a licensed liquor wholesaler

6

and licensed liquor supplier when the supplier grants the wholesaler "the right to offer, sell, and distribute" the supplier's brand(s) of intoxicating liquor in the state of Missouri, forming a commercial relationship of definite or continuing indefinite duration.  Mo. Rev. Stat. 407.400(1); *Brown-Forman Distillers Corp. v. McHenry*, 566 S.W.2d 194, 195–96 (Mo. banc 1978); *High Life Sales Co. v. Brown-Forman Corp.*, 823 S.W.2d 493, 501–02 (Mo. banc 1992).  There is *no* requirement that liquor suppliers and wholesalers also meet the statute's general definition of a franchise in order for a franchise to form.  *See id.*  Thus, Major Brands' relationship with Jägermeister easily meets the liquor-specific definition of franchise, which is all that is required.

However, even assuming *arguendo* that the general definition applied to this case, there are ample facts demonstrating a community of interest and trademark license under this Court's articulation of the applicable standard:

> To determine whether community of interest exists, a two-part test has been used: "(1) the distributor's investments must have been substantially franchise-specific, and (2) the distributor must have been required to make these investments by the parties' agreement or the nature of the business." *Mo. Beverage Co. Inc. v. Shelton Bros., Inc.*, 669 F.3d 873, 879-880 (8th Cir. 2012).

(ECF No. 192, Nov. 15, 2019 Order at 17.)  Other courts in this District have construed it even more broadly, stating that Missouri courts would "interpret 'community of interest' to mean, at a minimum, either (1) the franchisor benefits from the franchisee's marketing of the franchisor's product or service, or (2) the franchisee benefits from the franchisor's marketing of the product or service." *C & J Delivery, Inc. v. Emery Air Freight Corp.*, 647 F. Supp. 867, 872 (E.D. Mo. 1986) (emphasis added).

As Defendants' summary judgment papers amply demonstrate, Defendants are going to try to argue for every definition of community of interest *except* one actually adopted by the Missouri Supreme Court or any federal court in Missouri.  However, this Court and others in this Circuit

have already stated what is necessary to determine a community of interest, and *none* of the tests require some comparison of a wholesaler's relationship with the terminating supplier against its relationship with that of all of its other suppliers (as Defendants advocate).  Rather, the inquiry is tightly focused on the Major Brands-Jägermeister relationship—not Major Brands' relationship with any other supplier, such as Constellation or Pernod.  As the Missouri Supreme Court made abundantly clear in *High Life*, even a supplier accounting for a small amount of the wholesaler's business can have a franchise relationship.  In fact, a wholesaler can have a franchise relationship with any—or all—of its suppliers, no matter how large or small.  Franchises are certainly not created only between a wholesaler and its *biggest* supplier.  What Defendants propose would completely undermine Missouri's adopted three-tier system to ensure that suppliers do not have control over wholesalers and retail sellers of alcohol, as they did prior to prohibition.

Likewise, courts in the Eastern District have found a trademark license exists where a wholesaler "uses with permission [supplier's] name on its website, as well as all the names, logos, and trademarks of the various wines [sic] brands supplied by [supplier] for marketing and sale in Missouri."  *Garco Wine Co. v. Constellation Brands, Inc.*, No. 4:13-CV-00661-ERW, at *5–6 (E.D. Mo. Apr. 30, 2013) (ECF No. 16).  There is no question that Major Brands meets this standard given the ample point-of-sale materials Major Brands both created and utilized at both on- and off-premise accounts.

In light of the Court's construction, *these* are the facts relevant to the Missouri liquor franchise question—what is *not* relevant, and what will unduly prolong the trial and confuse the issues, is testimony regarding what Major Brands, Defendants, or other suppliers think *Shelton Bros.* meant or what Defendants' counsel or employees think the law *should* be (which would transport the jury to New Jersey).  Likewise, getting into mini-trials about Major Brands'

relationship with its other suppliers is irrelevant and a waste of time.  As Major Brands sets forth *infra*, Defendants will attempt to shift the focus to such sideshows that have no bearing on the question of whether the facts of this case—the facts of Major Brands and Jägermeister's relationship specifically—establish the license and community of interest elements of the franchise definition.

B.      *Tortious Interference*

Southern intentionally and unjustifiably induced Jägermeister to terminate its longstanding relationship with Major Brands through, among other things, its secret negotiations with, and ███████ ████████████████████████████████████████████  Those negotiations culminated in ███████ ███████████████████████████████████████████████████████████████████ ████████ ) for terminating Major Brands in violation of the Missouri Liquor Franchise Act. Southern's defense has been, and will likely continue to be, that it believed in "good faith" that the Missouri Liquor Franchise Act did not apply to Major Brands.  But the evidence will show that Southern knows that Missouri is a franchise state and affirmatively took steps to induce Major Brands' termination in spite of its own documents reflecting (and its own employees testifying) that Missouri is a franchise state.

Once again, Defendants are likely to shift the focus from their own bad acts and ask the jury to consider the actions of other industry actors.  However, as set forth *infra* and in Major Brands' Motion *in Limine* No. 2, industry practice is irrelevant as it cannot change Missouri law that declares Defendants' conduct was unlawful.

C.      *Major Brands' Damages*

Accounting for its long, successful history of distributing Jägermeister within the State of Missouri, Major Brands' damages expert, Dr. Alan Cox, a highly distinguished Ph.D. economist,

applied a damage methodology approved by the Missouri Supreme Court and calculated Major

Brands' lost profit damages over a multi-year timeframe to fall in the range of $13.7 million to

$18.1 million.

First, Dr. Cox calculated the actual profits Major Brands had earned from distributing the

Jägermeister brand in the years leading up to the termination.  Based on his review of Major

Brands' financial records, Dr. Cox calculated and deducted the cost of the products and the variable

expenses tied directly to the sale of the Jägermeister brand to arrive at Major Brands' prior

operating profits from distributing that brand.  Dr. Cox determined that Major Brands earned

between ███████████████ in annual sales revenue and between ███████████

███████ in annual operating profit from distributing Jägermeister during the last three full

calendar years before its termination (2015–17).

Based on its prior operating profits, Dr. Cox prepared a forecast of Major Brands' lost

profit damages over various time periods for the jury's consideration (20 years, 30 years, 40 years,

and a terminal value), discounted back to present value.  Because the damages are discounted to

present value using a ███ percent discount rate (based on Major Brands' weighted average cost

of capital), Major Brands' lost profit damages for each of the time periods presented are within a

relatively narrow range ($13.7 million, $15.9 million, $17 million, and $18.1 million,

respectively).

The methodology used by Dr. Cox to calculate the lost profit damages tracks precisely with

the methodology approved by the Missouri Supreme Court.  *See Ameristar Jet Charter, Inc. v.

Dodson Int'l Parts, Inc.*, 155 S.W.3d 50, 54 (Mo. banc 2005); *Am. Eagle Waste Indus., LLC v. St.

Louis Cty.*, 463 S.W.3d 11, 21–22 (Mo. Ct. App. 2015).

10

### III.    Defendant's Obfuscation of the Issues

Major Brands is committed to an efficient and speedy trial, targeted on the narrow *relevant* issues of this case, as outlined above.  Defendants, on the other hand, appear on a course to prolong the case and introduce irrelevant evidence.

#### A.    Mini-Trials on Wrong Relationships under the Wrong Standard

Defendants continue to ignore Missouri's and this Court's definition of franchise and instead are expected to introduce evidence that might be relevant to franchise-status in other States, but which has no relevance to this Missouri liquor distribution relationship.  Among other things, as was the case in discovery, Defendants are likely to focus on every relationship *but* the Jägermeister-Major Brands relationship, distracting the jury with evidence of Major Brands' relationships with other suppliers.  However, as set forth above and in Major Brands' Motions *in Limine* Nos. 1–2, such evidence is both irrelevant (to the community of interest inquiry or any other issue) and intended to be highly distracting to the jury—not to mention a complete waste of time.

Defendants will also undoubtedly attempt to introduce evidence comparing the Major Brands-Jägermeister relationship to non-liquor franchises, such as McDonald's, and non-liquor big-box retailers, such as Wal-Mart, in an attempt to confuse and mislead the jury on the community of interest and trademark elements.  (ECF No. 264 at 20–21; ECF No. 289 at 13.) However, as stated above, the Missouri courts have repeatedly found that liquor is different in the eyes of the law.  *State ex rel. Nixon v. Beer Nuts, Ltd.*, 29 S.W.3d 828, 836 (Mo. Ct. App. 2000) ("We start with the proposition that ***the liquor business stands on a different plane than other commercial operations.***") (citation omitted) (emphasis added).  Comparisons to big-box stores and restaurants are thus irrelevant, misleading, and will confuse the jury.

B.      *The Everyone-Else-Does-It Defense*

Defendants' primary defense throughout this litigation has been to claim that everyone else does it—that somehow supposed industry practice (defined by other States) can excuse their intentional violation of the Missouri Liquor Franchise Act.  More specifically, Major Brands anticipates that Defendants will try to introduce evidence that other wholesalers make large payments to obtain suppliers' business and offer indemnification for their termination of existing wholesalers.

The question in this case is whether Jägermeister's termination of Major Brands (admittedly without good cause) and Southern Glazer's offers to Jägermeister to induce that termination were lawful under Missouri law and/or the Major Brands-Jägermeister contract.  Mo. Rev. Stat. § 407.413 determines whether Jägermeister's termination was lawful, and Missouri courts have already stated that a defendant's attempt "to induce plaintiffs' customers to breach their existing contracts ***by offering to indemnify*** such customers against liability for the breach, states conduct which is wrongful . . . ."  *Downey v. United Weatherproofing, Inc.*, 253 S.W.2d 976, 982 (Mo. 1953) (emphasis added).  Yet, Southern continues to try to shift the focus by arguing that, somehow, industry practice can make permissible those very actions that Missouri courts have already found are wrongful and tortious.  Defendants are wrong, and courts have explicitly rejected similar arguments: "[T]he scope of [a defendant's] duties is defined by [State] law, ***not by the industry***[,]" thus even a "system-wide failure" to comply with statutory requirements would not "absolve[]" a defendant from liability.  *Peoples State Bank v. Stifel, Nicolaus & Co.*, No. 1:10–cv–1640–RLY–TAB, 2013 WL 1024917, at *7 (S.D. Ind. Mar. 14, 2013) (emphasis added).

Indeed, this Court has likewise already rejected Defendants' everyone-does-it defense in its Order excluding Defendants' industry practices "expert," Martin Jones:

> While it may be that a national relationship is common in the national liquor distribution industry, the focus of this law suit is whether Jagermeister could terminate the agreement with an alleged franchisee in Missouri without good cause, and whether, under Missouri law, the lack of "good cause" and Defendants' actions surrounding the termination can give rise to liability. This is because **the Missouri Franchise Act does not mention industry custom and practice** and does not require compliance with industry custom and practice in terminating a franchise. **The Act requires that "good cause" to terminate must exist and that is what the jury must determine in this case**.

(ECF No. 342, Apr. 30, 2021 Order, at 6–7 (emphasis added).)

In short, allowing Defendants to present evidence of what other industry actors do or do not do will confuse and mislead the jury and waste trial time with irrelevant issues and distinguishable conduct.

### C.      After-the-Fact Justifications for Termination

Although Jägermeister repeatedly admitted it lacked good cause to terminate Major Brands, Defendants are also expected to try to introduce evidence to undercut that admission and suggest that certain post-termination discovery or actions create good cause for termination.  For example, Defendants have already suggested that "Jägermeister would have had an independent basis to terminate its relationship with Plaintiff as soon as at least February 2020 . . . because Plaintiff experienced a change in control when the Wirtz Family Trust bought the controlling interest in the holding company that wholly owns Plaintiff."  (ECF No. 261 at 11.)  This argument is meritless.

As set forth more fully in Major Brands' Motion *in Limine* No. 3, Defendants are bound by their admission that they lacked good cause for termination and cannot now introduce evidence suggesting otherwise.  Moreover, Defendants' change-in-control argument also fails on every front.  First, as the sale happened two years *after* Jägermeister's termination, it obviously cannot constitute "first established" good cause.  Mo. Rev. Stat. § 407.413.2 ("[N]o supplier shall unilaterally terminate or refuse to continue or change substantially the condition of any franchise

with the wholesaler unless the supplier has ***first established*** good cause for such termination, noncontinuance or change.") (emphasis added).  Second, a change in control does not fit within any of the three *statutorily defined* options for "good cause."  *See* Mo. Rev. Stat. § 407.413.  Lastly, *there was no change in control* as the plaintiff, Major Brands, Inc., has not changed owners at all and has always remained 100% owned by Major Brands Holdings, Inc.  And the transfer in question was not to some unknown entity, but rather was a transfer of 50% of the holding company to a related owner of the remaining other 50%.  As this Court already found, the transaction in 2020 impacted Major Brands *Holdings,* Inc., ***not*** the plaintiff here, Major Brands, Inc.  (ECF No. 243 at 5 (denying Defendants' motion to reopen discovery in light of sale because "Defendants appear to be seeking information on the sale of Major Brands, Holdings, which is not the Plaintiff in this case") (emphasis added).)  As such, allowing such evidence for any issue, including damages, would be contrary to Missouri law and thus serve no purpose but to mislead and distract the jury.

## IV.    Conclusion

The open questions in this case are narrow.  Defendants' focus on the irrelevant in an attempt to hide the inevitable conclusion that Major Brands and Jägermeister had a franchise relationship can only, and is, indeed, intended to prolong the trial, confuse and mislead the jury, and prejudice the jury against Major Brands with *ad hominem* arguments.  The Court should grant Major Brands' motions *in limine*, filed contemporaneously herewith, to keep this trial focused on the narrow factual issues the jury must resolve.

Respectfully submitted,

**LEWIS RICE, LLC**


By:    /s/ Richard B. Walsh, Jr.
     Richard B. Walsh, Jr., #33523
     Evan Z. Reid, #51123
     Oliver H. Thomas, #60676
     Sarah A. Milunski, #65112
     600 Washington Avenue, Suite 2500
     St. Louis, Missouri 63101
     (314) 444-7660
     (314) 612-7660 facsimile
     rwalsh@lewisrice.com
     ereid@lewisrice.com
     othomas@lewisrice.com
     smilunski@lewisrice.com

*Attorneys for Plaintiff Major Brands, Inc.*