UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MAJOR BRANDS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:18-cv-00423-HEA |
| | ) | |
| MAST-JÄGERMEISTER US, INC. *et al*, | ) | |
| | ) | |
| Defendants. | ) | |

## THE TRIAL BRIEF OF DEFENDANTS SOUTHERN GLAZER WINE & SPIRITS LLC AND SOUTHERN GLAZER'S WINE AND SPIRITS OF MISSOURI, LLC

Major Brands, throughout the life of this case, has employed super-heated rhetoric to describe Southern Glazer's motives.  It must now replace that hyperbole with evidence but cannot do so.  Rather, Major Brands' claim that Southern Glazer's competitive conduct was tortious must be proven by substantial evidence—not speculation or conjecture or rhetoric—before it can be submitted to the jury.  The same is true with respect to Major Brand's civil conspiracy claim.  As the record has already shown and the evidence will further establish, when Southern Glazer accepted Jägermeister's terms, Jägermeister assured Southern Glazer that it had the legal right to move its Missouri portfolio from Major Brands, defeating both claims against Southern Glazer.

While Missouri does have a franchise statute[1], the *Shelton*[2] case, which this Court has already repeatedly and correctly applied, held that Missouri alcohol distributors had to meet the same requirements as any other Missouri business to claim franchise protection under the statute.

---

[1] *See* Mo. Rev. Stat. §§ 407.400(1), 407.413, hereinafter, the "Franchise Act."

[2] *Mo. Beverage Co., Inc. v. Shelton Bros., Inc.*, 669 F.3d 873 (8th Cir. 2012).

Southern Glazer relied on Jägermeister's repeated representation that its relationship with Major

Brands would not satisfy the test set forth in *Shelton* and that no contract existed between

Jägermeister and Major Brands.  That Southern Glazer relied on Jägermeister is no surprise or

nefarious act either; indeed, as an outside party, Southern Glazer was not privy to the inner

workings of the relationship between Jägermeister and Major Brands.  Southern Glazer's actions

were also informed, in part, by its own long-standing relationship with Jägermeister to distribute

its brands in other states; Southern Glazer's own relationship with other suppliers in Missouri;

and the fact that, for years, brands had freely moved from Southern Glazer's portfolio in

Missouri to Major Brands without compensation.  These facts alone negate, as a matter of law,

any finding that Southern Glazer intentionally interfered with Major Brands' relationship with

Jägermeister.

Moreover, as the trial testimony and documentary evidence will prove, Southern Glazer

was not the cause of Jägermeister's termination.  Rather, Jägermeister decided, months before

meeting with Southern Glazer, that it was going to nationally consolidate its portfolio in an effort

to remediate flagging sales, and had other options available to it than Southern Glazer.  And the

terms of the deal between Southern Glazer and Jägermeister were in response to the national

scope of the deal, and reflected standard industry practice.  To get to the jury, Major Brands will

need substantial evidence, not words, to support its claims.  Major Brands will not be able to

provide that support.

## ARGUMENT

## I.   MAJOR BRANDS CANNOT MAKE A SUBMISSIBLE CASE FOR TORTIOUS INTERFERENCE.

Federal Jury Practice & Instruction § 127:01 (modified) and Missouri Approved Jury

Instruction 23.11 are applicable to Major Brands' claim against Southern Glazer for tortious

interference.  Modified to fit the facts in this case, this instruction requires Major Brands to prove that: First, a franchise relationship existed between Major Brands and Jägermeister which was terminated by Jägermeister; and Second, Southern Glazer knew of such contract; and Third, Southern Glazer caused Jägermeister to terminate the franchise relationship with Major Brands; and Fourth, Southern Glazer did so intentionally; and Fifth, Southern Glazer acted without justification or excuse by employing improper means to further its own interests; and Sixth, Major Brands was thereby damaged.  Stated another way, Major Brands must prove: (1) that there existed a protectable business relationship; (2) that Southern Glazer had knowledge of that relationship; (3) that Southern Glazer intentionally interfered by inducing or causing a breach or severance of the relationship; (4) that there was no justification for Southern Glazer's actions; and (5) that Major Brands suffered damages as a result.  *Tamko Roofing Prods., Inc. v. Smith Eng'g Co.*, 450 F.3d 822, 829 (8th Cir. 2006) (applying Missouri law).  *See also* 34 ROBERT H. DIERKER AND RICHARD J. MEHAN, MO. PRAC., PERSONAL INJURY & TORTS HANDBOOK § 24:7 (2020 ed.).  Major Brands bears the burden of proving each element.  *See Londoff v. Walnut Street Sec., Inc.*, 209 S.W.3d 3, 7 (Mo. Ct. App. 2006).

To make a submissible case, Major Brands cannot predicate its claims on "speculation, conjecture or guesswork," which is all it has offered to date.  *Francisco v. Kansas City Star Co.*, 629 S.W.2d 524, 529 (Mo. Ct. App. 1981).  A submissible tortious interference case requires "a substantial evidentiary basis."  *Id.*; *see also Stehno v. Sprint Spectrum*, 186 S.W.3d 247, 253 (Mo. banc 2006); *Tri-Cont'l Leasing Co. v. Neidhardt*, 540 S.W.2d 210, 211 (Mo. Ct. App. 1976).  Major Brands will not be able to prove with substantial evidence any of the required elements of its tortious interference claim, let alone all of them.

A.    **Major Brands cannot prove with substantial evidence the existence of a**

**protectable business relationship with Jägermeister.**

Major Brands claims it had a statutorily protected franchise relationship with Jägermeister that could only have been terminated for good cause.  Its relationship with Jägermeister, however, does not satisfy the required elements of community of interest and a trademark license necessary to prove a franchise relationship.  For instance, there was no community of interest between Major Brands and Jägermeister since Major Brands sold thousands of competing brands, spent millions of dollars promoting those brands over Jägermeister's brands, and, for at least a decade, failed to reverse steadily declining sales of Jägermeister brands in the state.  Simply put, the relationship between Jägermeister and Major Brands was simply a conventional supplier/wholesaler relationship.  Try as it might, Major Brands cannot put itself in the shoes of a McDonald's; it is a food court.

Major Brands' claim of a franchise relationship with Jägermeister, moreover, must be based on a belief that is reasonable under the circumstances.  *Serv. Vending Co. v. Wal-Mart Stores, Inc.*, 93 S.W.3d 764, 769 (Mo. App. 2002); *see also* DIERKER AND MEHAN, *supra*, § 24:2 (citing *Stehno*, 186 S.W.3d at 250-51).  The reasonableness of the belief depends on both subjective and objective factors.  *See Stehno*, 186 S.W.3d at 250 ("The valid business expectancy requirement involves more than a mere subjective expectancy—it must be a *reasonable* expectancy…." (emphasis in original)); *see also Honigmann v. Hunter Grp., Inc.*, 733 S.W.2d 799, 806 (Mo. App. 1987) (evidence of plaintiff's state of mind was "independently relevant" to plaintiff's business expectancy).  Major Brands' claim is not reasonable as proven by both its subjective belief at the time of termination and objective marketplace factors.

The only evidence Major Brands will offer to support its relationship with Jägermeister is its belief, based entirely on the Franchise Act, that it had a franchise relationship with

Jägermeister.  As set forth above, and as will be shown at trial, its belief is unreasonable.  This is further supported by the fact that Major Brands had already been told that its relationship with Bacardi, a much larger supplier than Jägermeister, did not satisfy the community of interest or trademark license requirements necessary for the existence of a franchise relationship under the Act.  *Bacardi U.S.A., Inc. v. Major Brands, Inc.*, No. 13–20791–CIV, 2014 WL 2200042, at *12 (S.D. Fla. Mar. 20, 2014).  Major Brands will not be able to meet its burden of proof on the first element of its tortious interference claim at trial.

**B.**   **Major Brands cannot prove with substantial evidence that Southern Glazer had knowledge of a protectable business relationship between Major Brands and Jägermeister.**

In addition to proving the existence of an actual business relationship, Major Brands will have to provide substantial evidence that Southern Glazer had knowledge that Major Brands' relationship with Jägermeister was a legally protectable franchise relationship.  *See Tamko Roofing*, 450 F.3d at 829; *Preston v. Preston*, 823 S.W.2d 48, 50 (Mo. App. 1991) (holding that son could not establish that his stepmother tortiously interfered with his contract where son did not refute stepmother's affidavit stating that she had no knowledge of the contract); *see also* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 129, at 982 (5th ed. 1984) (quoted with approval in *Bell v. May Dep't Stores Co.*, 6 S.W.3d 871, 878 n.29 (Mo. banc 1999)) (The tort "presupposes knowledge of the plaintiff's contract or interest, or at least facts which would lead a reasonable person to believe that such interest exists.  Without such knowledge, there can be no intent and no liability.").  Major Brands cannot do so.

The evidence will demonstrate that Southern Glazer was unaware of any protected relationship between Jägermeister and Major Brands.  Both testimony and documents will establish that Jägermeister repeatedly informed Southern Glazer that it had no contract or

franchise with Major Brands and that Jägermeister was free to move its business to Southern

Glazer in Missouri.  Southern Glazer had no reason to doubt Jägermeister's representation,

especially in light of the *Shelton Brothers* and *Bacardi* decisions.  The evidence will also show

that Southern Glazer was well aware that Major Brands routinely welcomed brands that chose to

move from Southern Glazer to Major Brands in Missouri, demonstrating free movement of

brands in the state.

There is also no evidence that Southern Glazer bore Major Brands any ill will or desired

to harm it; rather the challenged transaction is a nationwide distribution deal between a

distributor and a supplier with a long-standing business relationship, which resulted from

Jägermeister's independent business decision to take action to improve flagging sales.  Major

Brands cannot prove that Southern Glazer had knowledge of a protectable franchise relationship

at the time of Jägermeister's termination.  On the contrary, the undisputed evidence negates this

essential element of Major Brands' claim.

    **C.**    **Major Brands cannot prove with substantial evidence that Southern Glazer intentionally interfered with Major Brands' relationship nor that Southern Glazer was the cause of Jägermeister's termination.**

Major Brands also cannot prove that Southern Glazer intentionally caused Jägermeister to

terminate its relationship with Major Brands.  *See Guidry v. Charter Commc'ns, Inc.*, 269

S.W.3d 520, 535-36 (Mo. App. 2008) ("A defendant induces a breach of contract if he actively

and affirmatively takes steps to induce the breach and the contract would have been performed

absent interference from the defendant." (quoting *Howard v. Youngman*, 81 S.W.3d 101, 114

(Mo. App. 2002))); *see also Fabricor, Inc. v. E.I. DuPont de Nemours & Co.*, 24 S.W.3d 82, 93-

94 (Mo. App. 2000) (combining the requirements of intent and causation into a two-part "but

for" test: "1) did [defendant] actively and affirmatively take steps to induce the breach; and, if so,

- 6 -

2) would the contract[] have been performed absent the [defendant's] interference?"); *Tamko*,

450 F.3d at 830 (same, applying Missouri law).

The Missouri court of appeals decision in *Guidry* aptly demonstrates why Major Brands

cannot prove Southern Glazer intentionally interfered with Major Brands' relationship with

Jägermeister.  *See Guidry*, 269 S.W.3d 520.  There, a cable provider and an apartment complex

had an exclusive 15-year service contract for tenants' cable service with an automatic renewal

period.  *Id.* at 524.  The complex sent notice to the provider that it wished to terminate the

contract due to poor performance, but the provider continued to provide cable service.  *Id.* at 525.

The complex then invited Charter to bid to become the exclusive provider.  *Id.*  Charter inquired

about the complex's contractual status with its current provider, and the complex responded that

it had a month-to-month arrangement that was terminable upon notice.  *Id.*  Charter placed its

bid, negotiated the terms of the contract (including an upfront payment of $100,000 to the

complex), and signed a "right of entry" contract with the complex.  *Id.* at 525, 536.  The complex

then terminated the existing provider, and Charter began providing service after the termination.

*Id.* at 525.

The terminated provider sued Charter for tortious interference.  The trial court entered

summary judgment in Charter's favor, which the court of appeals affirmed even though a jury

had determined that the complex's termination of the prior provider was in breach of the parties'

contract.  *Id.* at 536.  Critical to the court's affirmance was that "[t]he initial move to establish a

relationship was made by [the complex] after it had decided not to continue its relationship with

[the competing provider] on a long-term basis."  *Id*.

Similarly here, Jägermeister's CEO will testify that Jägermeister would have

consolidated its business with a national distributor regardless of whether it chose to do so with

Southern Glazer.  He will also testify that the decision was his alone and not influenced in any way by Southern Glazer. *See Tri-Cont'l Leasing Co.*, 540 S.W.2d at 216 (holding no tortious interference even though the defendant had approached the third party with whom the plaintiff had a contract because there was no evidence that but for the defendant's contact, the contract would be been performed); *see also Cmty. Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n (Cmty. Title I)*, 670 S.W.2d 895, 905 (Mo. App. 1984) (tortious interference claim requires "but for" causation).

Equally fatal to Major Brand's claim, the evidence will show that Jägermeister began reevaluating its distribution network and considering a consolidated national model in approximately January 2017.  It was months after Jägermeister initiated this process that Southern Glazer and Jägermeister even discussed the possibility of expanding Jägermeister's distribution footprint with Southern Glazer, and even that discussion was not specific to Missouri.  Jägermeister then continued its independent, internal evaluation of distribution options throughout 2017, including considering other national distributors.  Ultimately, Jägermeister made the independent business decision to consolidate with Southern Glazer across the country and executed a distributor agreement with Southern Glazer Wine & Spirits LLC on January 24, 2018.  This agreement expanded Southern Glazer's already existing distribution network for Jägermeister, and encompassed several new states, including Missouri.  Jägermeister then informed Plaintiff of this decision on February 13, 2018, two weeks after Jägermeister had already entered into the distribution agreement with Southern Glazer.

### D.     Major Brands cannot prove with substantial evidence that Southern Glazer's conduct was not justified nor that Southern Glazer used improper means.

Nor will Major Brands be able to overcome with substantial evidence the inescapable conclusion that Southern Glazer's conduct was justified.  "No liability arises for interfering with

a…business expectancy if the action complained of was an act which the defendant had a definite legal right to do without any qualification." *Cmty. Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n (Cmty. Title II)*, 796 S.W.2d 369, 372 (Mo. banc 1990); *see also Vilcek v. Uber USA, LLC*, 902 F.3d 815, 819 (8th Cir. 2018) (affirming Autrey, J. dismissal); *Macke Laundry Serv. Ltd. P'ship v. Jetz Serv. Co., Inc.*, 931 S.W.2d 166, 181 (Mo. App. 1996) (same). Moreover, "[t]he mere fact that defendant's conduct may have had a negative effect on plaintiffs' business expectancies does not, *a fortiori*, establish an absence of justification." *Cmty. Title II*, 796 S.W.2d at 373. A defendant's self-interested interference is not improper where the defendant has a "present existing economic interest." *Id.* at 372. An "existing economic interest" exists "when someone engages in competitive conduct." *Envtl. Energy Partners, Inc. v. Siemens Bldgs. Techs., Inc.*, 178 S.W.3d 691, 703 (Mo. App. 2005).

The competitive justification is absolute unless a plaintiff can prove that the competitor used "improper means." *Bishop & Assocs., LLC v. Ameren Corp.*, 520 S.W.3d 463, 472 (Mo. banc 2017); *Macke*, 931 S.W.2d at 181. It is undisputed that Major Brands and Southern Glazer are competitors, and therefore Southern Glazer's conduct is justified unless it utilized improper means. Major Brands has only identified two things it claims are improper: the multi-year nationwide marketing contribution and the indemnification agreement. Both fall far short of the "allegations of threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or common law" usually associated with improper means. DIERKER AND MEHAN, *supra*, § 24:7 (citing *BMK Corp. v. Clayton Corp.*, 226 S.W.3d 179 (Mo. App. 2007); *Adams v. USAA Cas. Ins. Co.*, 317 S.W.3d 66 (Mo. App. 2010)). "Recognized standards of business ethics and business customs and practices are pertinent [to whether improper means exist for purposes of tortious interference], and consideration is given

to concepts of fair play and whether the defendant's interference is not sanctioned by the 'rules

of the game.'"  *See* RESTATEMENT (SECOND) OF TORTS § 767 cmt. j (1979); *see also C.R. Bard,*

*Inc. v. Wordtronics Corp.*, 561 A.2d 694, 698 (N.J. Super. Ct. Law Div. 1989) (granting

summary judgment on tortious interference claim because plaintiff offered no proof beyond

"glittering generalities" that conduct violated "recognized ethical business codes" or "established

customs or practices"); *Walker v. Anderson-Oliver Title Ins. Agency, Inc.*, 309 P.3d 267, 274

(Utah Ct. App. 2013) (applying same tortious inference elements under Missouri law, and

recognizing that industry standards are benchmarks for whether action is improper (citing *Jones*

*& Trevor Mktg., Inc. v. Lowry*, 233 P.3d 538, 545 (Utah Ct. App. 2010))).  The conduct that

Major Brands complains of falls squarely within "the rules of the game."

      *1.   The indemnity agreement cannot constitute improper means.*

      Indemnification clauses are routine contractual terms in the liquor distribution industry,

as Major Brands is well aware, having itself entered into indemnity arrangements with suppliers.

The situation presented here is entirely different from the facts in *Downey v. United*

*Weatherproofing*, 253 S.W.2d 976 (Mo. 1953), upon which Major Brands has based the entirety

of its argument to the contrary.  There, the interferer knew there were valid contracts with its

competitor and offered to indemnify the customers for a clear breach of that contract while lying

about its competitor to induce the breach.  There will be no evidence that Southern Glazer ever

made any false or misleading statements about Major Brands to Jägermeister.  And Southern

Glazer did not **offer** indemnification.  When it acceded to Jägermeister's **demand** for

indemnification—already a long-standing business practice between the parties—Southern

Glazer had no reason to doubt that Jägermeister had the legal right to consolidate its portfolio

with Southern Glazer.  The indemnification agreement does not establish that Southern Glazer

employed improper means to expand its relationship with Jägermeister.  *See PMC, Inc. v. Saban Entm't, Inc.*, 52 Cal. Rptr. 2d 877, 605 (Cal. App. 1996) (rejecting that indemnification constituted improper means because "the indemnity agreement requested…was fair play….[It] increas[ed] the value of [the] bargain.  It was the direct result of hard negotiating…[and]…does not violate any established business ethics."), *disapproved of by Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937 (Cal. 2003)[3].

> 2. *The nationwide multi-year marketing contribution is not improper means.*

Over the course of a five-year contract encompassing the distribution of Jägermeister brands in 43 states, Southern Glazer agreed to pay Jägermeister $25 million to use toward national advertising that would mutually benefit both Southern Glazer and Jägermeister by increasing sales of Jägermeister's brands.  Major Brands cannot prove that this payment is outside of recognized "business practices."  On the contrary, testimony by witnesses for all parties, as well as Major Brands' own contracts, will show that such terms are standard and accepted in the industry.  *See Guidry*, 269 S.W.3d at 536 (rejecting that up-front payment to apartment complex in order to become exclusive supplier was improper means where "the undisputed evidence show[s] that this was a standard practice and the amount was negotiated after [the complex] had invited Charter"); *see also DiGiorgio Corp. v. Mendez & Co., Inc.*, 230 F. Supp. 2d 552, 565-66 (D.N.J. 2002) (dismissing tortious interference claim because complained-of conduct fell "well within the 'rules of the game' and offend[ed] no business practice or ethic").

---

[3] The *Korea Supply* court disapproved of the *PMC* court's holding that an improper but lawful purpose or motive could support intentional interference with a prospective economic advantage. Instead, *Korea Supply* held that the defendant's act must be wrongful by some legal measure. *Korea Supply Co.*, 63 P.3d at 954 n.11.

That the challenged contractual terms are standard industry practice is also supported by the fact that Jägermeister terminated six distributors after entering into the nationwide contract with Southern Glazer; Major Brands is the only one who sued over it.

> 3. *Jägermeister's alleged violation of the Franchise Act does not support improper means.*

Nor does **Jägermeister's** alleged violation of the Franchise Act supply the requisite improper means for **Southern Glazer**.  Importantly, the Franchise Act applies only to suppliers and their distributors upon meeting certain criteria.  *See* Mo. Rev. Stat. §§ 407.400(1), 407.413. By its plain terms, the statute does not apply to competing distributors in Missouri and, thus, does not prevent a competitor distributor from taking any action.  *See id.*  Jägermeister did not violate the Franchise Act.  But even assuming *arguendo* that it has, this still would not be enough as a matter of law.  Because the Franchise Act does not apply to Southern Glazer with respect to the relationship between Major Brands and Jägermeister, Southern Glazer did not—and indeed could not—violate the statute.  There is therefore no statutory violation by, or private cause of action against, Southern Glazer to suffice as the improper means to support a tortious interference claim.  *See, e.g.*, *Vilcek*, 902 F.3d at 820 (holding violation of Missouri statutes and regulations can only suffice as improper means if a private right of action for the violation exists).  As a result, Major Brands cannot use any alleged violation of the Missouri Franchise Act as evidence at trial to establish improper means.

## II.   MAJOR BRANDS CANNOT MAKE A SUBMISSIBLE CASE FOR CIVIL CONSPIRACY.

To prevail on its civil conspiracy claim under Missouri law, Major Brands must prove, with "clear[] and convincing[] established facts" that Jägermeister and Southern Glazer had an unlawful objective and, after a meeting of the minds, they committed at least one act in furtherance of that unlawful objective, causing damage to Major Brands.  8th Cir. Manual Model

Civ. Jury Instr. 3.04 (2020); MAI 3.01 [1998 Revision]; Fed. Jury Prac. & Instr., § 104:02.  *See also Oak Bluff Partners, Inc. v. Meyer*, 3 S.W.3d 777, 781 (Mo. banc 1999); *Chmieleski v. City Prods. Corp.*, 660 S.W.2d 275, 290 (Mo. App. 1983).  A plaintiff cannot recover for civil conspiracy when the underlying tort has been dismissed.  *Williams v. Mercantile Bank of St. Louis NA*, 845 S.W.2d 78, 85 (Mo. Ct. App. 1993).

The entire premise of Major Brand's conspiracy claim is that Jägermeister and Southern Glazer conspired to breach Jägermeister's alleged agreement with Major Brands.  But Jägermeister had no agreement with Major Brands, beyond that of a terminable at-will distribution arrangement.  Moreover, for the reasons stated above, its tortious inference claim likewise fails.  Because Major Brands cannot prevail on its franchise, contract and tortious interference claims, it will be unable to make a submissible case for its conspiracy claim.

Equally as lethal to its conspiracy claim, there will be no evidence at trial, let alone clear and convincing evidence, that Southern Glazer or Jägermeister believed the purpose of their agreement was unlawful.  Absent such a showing, the conspiracy claim fails because it "must be supported by clear and convincing proof that the alleged conspirators **knowingly** performed any act or took any action to further or carry out the **unlawful purposes** of the conspiracy." *Hamilton v. Spencer*, 929 S.W.2d 762, 767 (Mo. Ct. App. 1996) (internal quotations omitted and emphasis added); *see also The Oliver Family Interests Ltd. v. Wright*, No. 08-3075-CV-S-DW, 2012 WL 12893873, at *5 (W.D. Mo. Jan. 24, 2012) (requiring that "the defendants were aware of the unlawfulness" of their act).  Jägermeister informed Southern Glazer that it had no contract or franchise with Major Brands and therefore was able to move its business to Southern Glazer. The evidence will show that Jägermeister reaffirmed this representation in the agreement it executed with Southern Glazer.

- 13 -

There will also be no evidence at trial that Southern Glazer targeted Major Brands, or even the Missouri market, in agreeing to national distribution of Jägermeister products.  To the contrary, the undisputed evidence will clearly demonstrate that Jägermeister made an independent business decision to consolidate nationally and informed Southern Glazer of the same.  Jägermeister, moreover, had already begun evaluating national consolidation of its distribution network before it had a single conversation about consolidation with Southern Glazer.  Because no evidence will show an unlawful purpose or intentional interference, Major Brands will fail to make a submissible case on its conspiracy claim.

### III.  MAJOR BRANDS CANNOT PROVE WITH SUBSTANTIAL EVIDENCE THAT IT IS ENTITLED TO ACTUAL DAMAGES EQUATING TO LOST PROFITS DAMAGES IN PERPETUITY.

Major Brands seeks the astronomical sum of $40 million in actual damages, using a lost profits analysis that assumes that Major Brands would remain a Jägermeister distributor forever. The general rule is that lost profits are "too remote and speculative to warrant recovery," and proof of lost profits must be "substantial."  *Tipton v. Mill Creek Gravel, Inc.*, 373 F.3d 913, 918 (8th Cir. 2004) (construing Missouri law).  Major Brands' damage calculation does not meet this exacting standard for many reasons.

First, Major Brands cannot claim more than five years of lost profits because the contract between Southern Glazer and Jägermeister only has a five-year term, expiring in 2023.  There is absolutely nothing stopping Major Brands from competing for Jägermeister's business in 2023. This is especially true now that Major Brands is owned by the same family that owns Wirtz, a well-regarded and very competitive national distributor.

Second, it is widely known in the industry, and even admitted to by a former executive at Major Brands, that suppliers must consent to a change of control by a distributor.  Change of

control has been found to be "good cause" under Missouri's franchise statute.  *See Bacardi U.S.A., Inc.*, 2014 WL 2200042 at *12 n.25 ("Major Brands' argument that events such as a change in control…do not constitute 'good cause' under the Act is unconvincing."); *see also C.L. Thompson Co. v. Festo Corp.*, 708 F. Supp. 221, 224 (E.D. Wis. 1989).  Thus, even if Jägermeister had not terminated Major Brands in February 2018, it would have had the right to do so when the Wirtz family took complete control of Major Brands in 2020, further limiting any lost profits Major Brands could claim to just a few years.

Equally importantly, Major Brands' damages expert had no basis for his sales forecast into perpetuity.  He is not an expert in the alcohol distribution business and relied solely on a published 2019 nationwide industry forecast for all liqueur and other spirits projecting through 2023.  He had no basis to extrapolate a four-year forecast into a forecast of twenty years to forever.  *See Cole v. Homier Distrib. Co., Inc*., 599 F.3d 856, 866-67 (8th Cir. 2010) (applying Missouri law to tortious interference claim and affirming district court's refusal to permit a lost-profits calculation of twenty-five years because "[t]he notion that performance under [a distribution agreement terminable by either party for cause] would continue for twenty-five years is too speculative").  No wine and spirits industry expert estimates sales trends longer than five years because industry trends change drastically and quickly.  For example, the sale of hard seltzer five years ago was negligible; it is now one of the fastest-growing sectors in the liquor industry.

Finally, Major Brands' sales of Jägermeister were on a long-standing downward trend.  Its performance over the course of the following two or three years almost assuredly would have provided sufficient cause.

## IV.     MAJOR BRANDS CANNOT PROVE WITH CLEAR AND CONVINCING EVIDENCE THAT IT IS ENTITLED TO PUNITIVE DAMAGES.

There is no "clear and convincing" evidence that Southern Glazer acted with an "evil motive" or "reckless indifference" or that shows Southern Glazer's conduct was "outrageous," all of which Major Brands is required to prove to obtain punitive damages.  *See* MAI 10.01 ("If you find the issues in favor of plaintiff, and if you believe the conduct of defendant as submitted in [] was outrageous because of defendant's evil motive or reckless indifference to the rights of others, then in addition to any damages to which you find plaintiff entitled under [], you may award plaintiff an additional amount as punitive damages in such sum as you believe will serve to punish defendant and to deter defendant and others from like conduct."); *see also Blanks v. Fluor Corp.*, 450 S.W.3d 308, 401 (Mo. Ct. App. 2014); *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 111 (Mo. banc 1996).

After seeking Jägermeister's repeated reassurance that it was free to move its brands in Missouri and elsewhere, and based on Southern Glazer's long-standing observations and interactions with other industry participants, including Major Brands, Southern Glazer concluded that Jägermeister and Major Brands did not have a franchise relationship or a contractual relationship.  The reasonableness of this conclusion is aptly supported by both the Eighth Circuit's opinion in *Shelton Brothers* as well as the Southern District of Florida's decision in *Bacardi*. The terms of the contract between Jägermeister and Southern Glazer likewise cannot support punitive damages because they reflect standard industry terms, are appropriate given the nationwide scope of the distribution relationship and the length of the contract, and are consistent with terms Major Brands had agreed to with respect to other suppliers in Missouri.

## CONCLUSION

It will become abundantly clear at trial that not only does Major Brands have no substantial evidence to prove its claims against Southern Glazer, but also that Major Brands has

no substantial proof that the transaction between Southern Glazer and Jägermeister was outside

established practices in the highly competitive alcohol distribution industry.


Respectfully submitted,

THOMPSON COBURN LLP

By:/s/   Amanda J. Hettinger
        Nicholas J. Lamb, #33486MO
        Lawrence C. Friedman, #34382MO
        Amanda J. Hettinger, #55038MO
        Elise N. Puma, #68336MO
        Daniel A. Garcia, #70071MO
        One U.S. Bank Plaza, Suite 2700
        St. Louis, Missouri  63101
        314-552-6000
        FAX 314-552-7000
        nlamb@thompsoncoburn.com
        lfriedman@thompsoncoburn.com
        ahettinger@thompsoncoburn.com
        epuma@thompsoncoburn.com
        dgarcia@thompsoncoburn.com

        *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2021, I electronically filed the Motion with the Clerk of the Court using the CM/ECF system and served via electronic mail on the following counsel of record:

Richard B. Walsh, Jr.
Evan Z. Reid
Oliver H. Thomas
Sarah A. Milunski
Lewis Rice LLC
600 Washington Avenue, Suite 2500
St. Louis, MO 63101

*Attorneys for Plaintiff*

/s/   Amanda J. Hettinger

- 17 -